(Slip Opinion)      OCTOBER TERM, 2010      1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CULLEN, ACTING WARDEN *v.* PINHOLSTER

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–1088. Argued November 9, 2010—Decided April 4, 2011

A California jury convicted respondent Pinholster on two counts of first-degree murder. At the penalty phase before the same jury, the prosecution produced eight witnesses, who testified about Pinholster's history of threatening and violent behavior. Pinholster's trial counsel, who unsuccessfully sought to exclude the aggravating evidence on the ground that the prosecution had not given Pinholster proper notice under California law, called only Pinholster's mother. Counsel did not call a psychiatrist, though they had consulted with Dr. Stalberg, who had diagnosed Pinholster with antisocial personality disorder. The jury recommended the death penalty, and Pinholster was sentenced to death. Pinholster twice sought habeas relief in the California Supreme Court, alleging, *inter alia,* that his trial counsel had failed to adequately investigate and present mitigating evidence during the penalty phase. He introduced additional evidence to support his claim: school, medical, and legal records; and declarations from family members, one of his trial attorneys, and Dr. Woods, a psychiatrist who diagnosed him with bipolar mood disorder and seizure disorders, and who criticized Dr. Stalberg's report. Each time, the State Supreme Court unanimously and summarily denied the claim on the merits. Subsequently, a Federal District Court held an evidentiary hearing and granted Pinholster federal habeas relief under 28 U. S. C. §2254. Affirming, the en banc Ninth Circuit considered the new evidence adduced in the District Court hearing and held that the State Supreme Court's decision "involved an unreasonable application of . . . clearly established Federal law," §2254(d)(1).

*Held*:

    1. Review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Pp. 8–14.

Syllabus

(a) As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), §2254 sets several limits on a federal court's power to grant habeas relief to a state prisoner. As relevant here, a claim that has been "adjudicated on the merits in State court proceedings," "shall not be granted . . . unless the adjudication" "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." §2254(d). This "difficult to meet," *Harrington* v. *Richter*, 562 U. S. ___, ___, and "'highly deferential standard' . . . demands that state-court decisions be given the benefit of the doubt," *Woodford* v. *Visciotti*, 537 U. S. 19, 24. Section 2254(d)(1)'s backward-looking language—"resulted in" and "involved"—requires an examination of the state-court decision at the time it was made. It follows that the record under review is also limited to the record in existence at that same time—*i.e.,* the state-court record. This understanding is compelled by "the broader context of the statute as a whole," which demonstrates Congress' intent to channel prisoners' claims first to state courts. *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 341. It is also consistent with this Court's precedents, which emphasize that §2254(d)(1) review focuses on what a state court knew and did. See, *e.g., Lockyer* v. *Andrade*, 538 U. S. 63, 71–72. Moreover, it is consistent with *Schriro* v. *Landrigan*, 550 U. S. 465, 474, which explained that a federal habeas court is "not required to hold an evidentiary hearing" when the state-court record "precludes habeas relief" under §2254(d)'s limitations. The Ninth Circuit wrongly interpreted *Williams* v. *Taylor*, 529 U. S. 420, and *Holland* v. *Jackson*, 542 U. S. 649, as supporting the contrary view. Pp. 8–12.

(b) This holding does not render superfluous §2254(e)(2)—which limits the federal habeas courts' discretion to take new evidence in an evidentiary hearing. At a minimum, §2254(e)(2) still restricts their discretion in claims that were not adjudicated on the merits in state court. Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so. Pp. 13–14.

(c) Remand for a properly limited review is inappropriate here, because the Ninth Circuit ruled, in the alternative, that Pinholster merited habeas relief on the state-court record alone. P. 14.

2. On the record before the state court, Pinholster was not entitled to federal habeas relief. Pp. 14'–31.

(a) To satisfy §2254(d)(1)'s "unreasonable application" prong, he must show that "there was no reasonable basis" for the State Supreme Court's summary decision. *Richter, supra,* at ___. Pp. 15–16.

(b) *Strickland* v. *Washington*, 466 U. S. 668, provides the clearly established federal law here. To overcome the strong presumption that counsel has acted competently, *id.,* at 690, a defendant must show that counsel failed to act "reasonabl[y] considering all the circumstances," *id.,* at 688, and must prove the "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.,* at 694. Review here is thus "doubly deferential," *Knowles* v. *Mirzayance*, 556 U. S. ___, ___, requiring a "highly deferential" look at counsel's performance, *Strickland, supra,* at 689, through §2254(d)'s "deferential lens," *Mirzayance, supra,* at ___, n. 2. Pp. 16–18.

(c) Pinholster has not shown that the State Supreme Court's decision that he could not demonstrate deficient performance by his trial counsel necessarily involved an unreasonable application of federal law. Pp. 18–26.

(1) The state-court record supports the idea that his counsel acted strategically to get the prosecution's aggravation witnesses excluded for lack of notice, and if that failed, to put on his mother as a mitigation witness. Billing records show that they spent time investigating mitigating evidence. The record also shows that they had an unsympathetic client who had boasted about his criminal history during the guilt phase, leaving them with limited mitigation strategies. In addition, when Dr. Stalberg concluded that Pinholster had no significant mental disorder or defect, he was aware of Pinholster's medical and social history. Given these impediments, it would have been a reasonable penalty-phase strategy to focus on evoking sympathy for Pinholster's mother. Pinholster has responded with only a handful of *post-hoc* nondenials by one of his lawyers. Pp. 18–23.

(2) The Ninth Circuit misapplied *Strickland* when it drew from this Court's recent cases a "constitutional duty to investigate" and a principle that it was *prima facie* ineffective for counsel to abandon an investigation based on rudimentary knowledge of Pinholster's background. Beyond the general requirement of reasonableness, "specific guidelines are not appropriate" under *Strickland.* 466 U. S., at 688. Nor did the Ninth Circuit properly apply the strong presumption of competence mandated by *Strickland.* Pp. 23–26.

(d) Even if his trial counsel had performed deficiently, Pinholster also has failed to show that the State Supreme Court must have unreasonably concluded that he was not prejudiced. Pp. 26–31.

(1) To determine "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that" death was not warranted, *Strickland, supra,* at 695, the aggravating evidence is reweighed "against the totality of available mitigating evidence," *Wiggins* v. *Smith*, 539 U. S. 510, 534. Here, the State pre-

sented extensive aggravating evidence at both the guilt and penalty phases. The mitigating evidence consisted primarily of the penalty-phase testimony of Pinholster's mother and guilt-phase testimony given by his brother. After considering the evidence, the jury returned a sentence of death, which the state trial court found supported overwhelmingly by the weight of the evidence. Pp. 26–29.

(2) There is no reasonable probability that the additional evidence presented at Pinholster's state proceedings would have changed the verdict. The "new" evidence largely duplicated the mitigation evidence of his mother and brother at trial. To the extent that there were new factual allegations or evidence, much of it is of questionable mitigating value. Dr. Woods' testimony would have opened the door to rebuttal by a state expert; and new evidence relating to Pinholster's substance abuse, mental illness, and criminal problems could lead a jury to conclude that he was beyond rehabilitation. The remaining new material in the state habeas record is sparse. Given what little additional mitigating evidence Pinholster presented in state habeas, the Court cannot say that the State Supreme Court's determination was unreasonable. Pp. 29–30.

(3) Because this Court did not apply AEDPA deference to the question of prejudice in *Williams* v. *Taylor,* 529 U. S. 362, and *Rompilla* v. *Beard*, 545 U. S. 374, those cases lack the important "doubly deferential" standard of *Strickland* and AEDPA, and thus offer no guidance with respect to whether a state court has unreasonably determined that prejudice is lacking. Pp. 30–31.

590 F. 3d 651, reversed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA and KENNEDY, JJ., joined in full; in which ALITO, J., joined as to all but Part II; in which BREYER, J., joined as to Parts I and II; and in which GINSBURG and KAGAN, JJ., joined as to Part II. ALITO, J., filed an opinion concurring in part and concurring in the judgment. BREYER, J., filed an opinion concurring in part and dissenting in part. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG and KAGAN, JJ., joined as to Part II.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–1088

VINCENT CULLEN, ACTING WARDEN, PETITIONER *v.* SCOTT LYNN PINHOLSTER

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 4, 2011]

JUSTICE THOMAS delivered the opinion of the Court.*

Scott Lynn Pinholster and two accomplices broke into a house in the middle of the night and brutally beat and stabbed to death two men who happened to interrupt the burglary. A jury convicted Pinholster of first-degree murder, and he was sentenced to death.

After the California Supreme Court twice unanimously denied Pinholster habeas relief, a Federal District Court held an evidentiary hearing and granted Pinholster habeas relief under 28 U. S. C. §2254. The District Court concluded that Pinholster's trial counsel had been constitutionally ineffective at the penalty phase of trial. Sitting en banc, the Court of Appeals for the Ninth Circuit affirmed. *Pinholster* v. *Ayers*, 590 F. 3d 651 (2009). Considering the new evidence adduced in the District Court hearing, the Court of Appeals held that the California Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." §2254(d)(1).

We granted certiorari and now reverse.

———————
*JUSTICE GINSBURG and JUSTICE KAGAN join only Part II.

## I

## A

On the evening of January 8, 1982, Pinholster solicited Art Corona and Paul David Brown to help him rob Michael Kumar, a local drug dealer. On the way, they stopped at Lisa Tapar's house, where Pinholster put his buck knife through her front door and scratched a swastika into her car after she refused to talk to him. The three men, who were all armed with buck knives, found no one at Kumar's house, broke in, and began ransacking the home. They came across only a small amount of marijuana before Kumar's friends, Thomas Johnson and Robert Beckett, arrived and shouted that they were calling the police.

Pinholster and his accomplices tried to escape through the rear door, but Johnson blocked their path. Pinholster backed Johnson onto the patio, demanding drugs and money and repeatedly striking him in the chest. Johnson dropped his wallet on the ground and stopped resisting. Beckett then came around the corner, and Pinholster attacked him, too, stabbing him repeatedly in the chest. Pinholster forced Beckett to the ground, took both men's wallets, and began kicking Beckett in the head. Meanwhile, Brown stabbed Johnson in the chest, "'bury[ing] his knife to the hilt.'" 35 Reporter's Tr. 4947 (hereinafter Tr.). Johnson and Beckett died of their wounds.

Corona drove the three men to Pinholster's apartment. While in the car, Pinholster and Brown exulted, "'We got 'em, man, we got 'em good.'" *Ibid.* At the apartment, Pinholster washed his knife, and the three split the proceeds of the robbery: $23 and one quarter-ounce of marijuana. Although Pinholster instructed Corona to "lay low," Corona turned himself in to the police two weeks later. *Id.,* at 4955. Pinholster was arrested shortly thereafter and threatened to kill Corona if he did not keep quiet about the burglary and murders. Corona later became the

State's primary witness. The prosecution brought numerous charges against Pinholster, including two counts of first-degree murder.

## B

The California trial court appointed Harry Brainard and Wilbur Dettmar to defend Pinholster on charges of first-degree murder, robbery, and burglary. Before their appointment, Pinholster had rejected other attorneys and insisted on representing himself. During that time, the State had mailed Pinholster a letter in jail informing him that the prosecution planned to offer aggravating evidence during the penalty phase of trial to support a sentence of death.

The guilt phase of the trial began on February 28, 1984. Pinholster testified on his own behalf and presented an alibi defense. He claimed that he had broken into Kumar's house alone at around 8 p.m. on January 8, 1982, and had stolen marijuana but denied killing anyone. Pinholster asserted that later that night around 1 a.m., while he was elsewhere, Corona went to Kumar's house to steal more drugs and did not return for three hours. Pinholster told the jury that he was a "professional robber," not a murderer. 43 *id.,* at 6204. He boasted of committing hundreds of robberies over the previous six years but insisted that he always used a gun, never a knife. The jury convicted Pinholster on both counts of first-degree murder.

Before the penalty phase, Brainard and Dettmar moved to exclude any aggravating evidence on the ground that the prosecution had failed to provide notice of the evidence to be introduced, as required by Cal. Penal Code Ann. §190.3 (West 2008). At a hearing on April 24, Dettmar argued that, in reliance on the lack of notice, he was "not presently prepared to offer anything by way of mitigation." 52 Tr. 7250. He acknowledged, however, that the prosecu-

tor "possibly ha[d] met the [notice] requirement." *Ibid.*
The trial court asked whether a continuance might be
helpful, but Dettmar declined, explaining that he could
not think of a mitigation witness other than Pinholster's
mother and that additional time would not "make a great
deal of difference." *Id.,* at 7257–7258. Three days later,
after hearing testimony, the court found that Pinholster
had received notice while representing himself and denied
the motion to exclude.

The penalty phase was held before the same jury that
had convicted Pinholster. The prosecution produced eight
witnesses, who testified about Pinholster's history of
threatening and violent behavior, including resisting
arrest and assaulting police officers, involvement with
juvenile gangs, and a substantial prison disciplinary
record. Defense counsel called only Pinholster's mother,
Burnice Brashear. She gave an account of Pinholster's
troubled childhood and adolescent years, discussed Pin-
holster's siblings, and described Pinholster as "a perfect
gentleman at home." *Id.,* at 7405. Defense counsel did not
call a psychiatrist, though they had consulted Dr. John
Stalberg at least six weeks earlier. Dr. Stalberg noted
Pinholster's "psychopathic personality traits," diagnosed
him with antisocial personality disorder, and concluded
that he "was not under the influence of extreme mental or
emotional disturbance" at the time of the murders. App.
131.

After 2½ days of deliberation, the jury unanimously
voted for death on each of the two murder counts. On
mandatory appeal, the California Supreme Court affirmed
the judgment. *People* v. *Pinholster*, 1 Cal. 4th 865, 824
P. 2d 571 (1992).

## C

In August 1993, Pinholster filed his first state habeas
petition. Represented by new counsel, Pinholster alleged,

*inter alia*, ineffective assistance of counsel at the penalty phase of his trial. He alleged that Brainard and Dettmar had failed to adequately investigate and present mitigating evidence, including evidence of mental disorders. Pinholster supported this claim with school, medical, and legal records, as well as declarations from family members, Brainard, and Dr. George Woods, a psychiatrist who diagnosed Pinholster with bipolar mood disorder and seizure disorders. Dr. Woods criticized Dr. Stalberg's report as incompetent, unreliable, and inaccurate. The California Supreme Court unanimously and summarily[1] denied Pinholster's penalty-phase ineffective-assistance claim "on the substantive ground that it is without merit." App. to Pet. for Cert. 302.

Pinholster filed a federal habeas petition in April 1997. He reiterated his previous allegations about penalty-phase ineffective assistance and also added new allegations that his trial counsel had failed to furnish Dr. Stalberg with adequate background materials. In support of the new allegations, Dr. Stalberg provided a declaration stating that in 1984, Pinholster's trial counsel had provided him with only some police reports and a 1978 probation report. Dr. Stalberg explained that, had he known about the material that had since been gathered by Pinholster's habeas counsel, he would have conducted "further inquiry" before concluding that Pinholster suffered only from a personality disorder. App. to Brief in Opposition 219. He noted that Pinholster's school records showed evidence of "some degree of brain damage." *Ibid.* Dr. Stalberg did not, however, retract his earlier diagnosis. The parties stipulated that this declaration had never been submitted to the California Supreme Court, and the federal petition

_____

[1] Although the California Supreme Court initially issued an order asking the State to respond, it ultimately withdrew that order as "improvidently issued." App. to Pet. for Cert. 302.

was held in abeyance to allow Pinholster to go back to
state court.

In August 1997, Pinholster filed his second state habeas
petition, this time including Dr. Stalberg's declaration and
requesting judicial notice of the documents previously
submitted in support of his first state habeas petition. His
allegations of penalty-phase ineffective assistance of coun-
sel mirrored those in his federal habeas petition. The
California Supreme Court again unanimously and sum-
marily denied the petition "on the substantive ground that
it is without merit."[2] App. to Pet. for Cert. 300.

Having presented Dr. Stalberg's declaration to the state
court, Pinholster returned to the District Court. In No-
vember 1997, he filed an amended petition for a writ of
habeas corpus. His allegations of penalty-phase ineffec-
tive assistance of counsel were identical to those in his
second state habeas petition. Both parties moved for
summary judgment and Pinholster also moved, in the
alternative, for an evidentiary hearing.

The District Court concluded that the Antiterrorism and
Effective Death Penalty Act of 1996 (AEDPA), 110 Stat.
1214, did not apply and granted an evidentiary hearing.
Before the hearing, the State deposed Dr. Stalberg, who
stated that none of the new material he reviewed altered
his original diagnosis. Dr. Stalberg disagreed with Dr.
Woods' conclusion that Pinholster suffers from bipolar
disorder. Pinholster did not call Dr. Stalberg to testify at
the hearing. He presented two new medical experts: Dr.
Sophia Vinogradov, a psychiatrist who diagnosed Pinhol-
ster with organic personality syndrome and ruled out
antisocial personality disorder, and Dr. Donald Olson, a

_____

[2] A majority also "[s]eparately and independently" denied several
claims, including penalty-phase ineffective assistance of counsel, as
untimely, successive, and barred by res judicata. *Id.,* at 300. The State
has not argued that these procedural rulings constitute adequate and
independent state grounds that bar federal habeas review.

pediatric neurologist who suggested that Pinholster suffers from partial epilepsy and brain injury. The State called Dr. F. David Rudnick, a psychiatrist who, like Dr. Stalberg, diagnosed Pinholster with antisocial personality disorder and rejected any diagnosis of bipolar disorder.

## D

The District Court granted habeas relief. Applying pre-AEDPA standards, the court granted the habeas petition "for inadequacy of counsel by failure to investigate and present mitigation evidence at the penalty hearing." App. to Pet. for Cert. 262. After *Woodford* v. *Garceau*, 538 U. S. 202 (2003), clarified that AEDPA applies to cases like Pinholster's, the court amended its order but did not alter its conclusion. Over a dissent, a panel of the Court of Appeals for the Ninth Circuit reversed. *Pinholster* v. *Ayers*, 525 F. 3d 742 (2008).

On rehearing en banc, the Court of Appeals vacated the panel opinion and affirmed the District Court's grant of habeas relief. The en banc court held that the District Court's evidentiary hearing was not barred by 28 U. S. C. §2254(e)(2). The court then determined that new evidence from the hearing could be considered in assessing whether the California Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" under §2254(d)(1). See 590 F. 3d, at 666 ("Congress did not intend to restrict the inquiry under §2254(d)(1) only to the evidence introduced in the state habeas court"). Taking the District Court evidence into account, the en banc court determined that the California Supreme Court unreasonably applied *Strickland* v. *Washington*, 466 U. S. 668 (1984), in denying Pinholster's claim of penalty-phase ineffective assistance of counsel.

Three judges dissented and rejected the majority's conclusion that the District Court hearing was not barred by §2254(e)(2). 590 F. 3d, at 689 (opinion of Kozinski,

C. J.) (characterizing Pinholster's efforts as "habeas-by-sandbagging"). Limiting its review to the state-court record, the dissent concluded that the California Supreme Court did not unreasonably apply *Strickland*. 590 F. 3d*,* at 691–723.

We granted certiorari to resolve two questions. 560 U. S. ___ (2010). First, whether review under §2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal habeas court. Second, whether the Court of Appeals properly granted Pinholster habeas relief on his claim of penalty-phase ineffective assistance of counsel.

## II

We first consider the scope of the record for a §2254(d)(1) inquiry. The State argues that review is limited to the record that was before the state court that adjudicated the claim on the merits. Pinholster contends that evidence presented to the federal habeas court may also be considered. We agree with the State.

## A

As amended by AEDPA, 28 U. S. C. §2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner. Section 2254(a) permits a federal court to entertain only those applications alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." Sections 2254(b) and (c) provide that a federal court may not grant such applications unless, with certain exceptions, the applicant has exhausted state remedies.

If an application includes a claim that has been "adjudicated on the merits in State court proceedings," §2254(d), an additional restriction applies. Under §2254(d), that application "shall not be granted with respect to [such a]

claim . . . unless the adjudication of the claim":

> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

This is a "difficult to meet," *Harrington* v. *Richter*, 562 U. S. ___, ___ (2011) (slip op., at 12), and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt," *Woodford* v. *Visciotti*, 537 U. S. 19, 24 (2002) *(per curiam)* (citation and internal quotation marks omitted). The petitioner carries the burden of proof. *Id.,* at 25.

We now hold that review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time—*i.e.*, the record before the state court.

This understanding of the text is compelled by "the broader context of the statute as a whole," which demonstrates Congress' intent to channel prisoners' claims first to the state courts. *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 341 (1997). "The federal habeas scheme leaves primary responsibility with the state courts . . . ." *Visciotti*, *supra,* at 27. Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief. It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court

decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*.

Limiting §2254(d)(1) review to the state-court record is consistent with our precedents interpreting that statutory provision. Our cases emphasize that review under §2254(d)(1) focuses on what a state court knew and did. State-court decisions are measured against this Court's precedents as of "the time the state court renders its decision." *Lockyer* v. *Andrade*, 538 U. S. 63, 71–72 (2003). To determine whether a particular decision is "contrary to" then-established law, a federal court must consider whether the decision "applies a rule that contradicts [such] law" and how the decision "confronts [the] set of facts" that were before the state court. *Williams* v. *Taylor*, 529 U. S. 362, 405, 406 (2000) *(Terry Williams)*. If the state-court decision "identifies the correct governing legal principle" in existence at the time, a federal court must assess whether the decision "unreasonably applies that principle to the facts of the prisoner's case." *Id.,* at 413. It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.[3]

_____

[3] JUSTICE SOTOMAYOR argues that there is nothing strange about allowing consideration of new evidence under §2254(d)(1) because, in her view, it would not be "so different" from some other tasks that courts undertake. *Post*, at 13 (dissenting opinion). What makes the consideration of new evidence strange is not how "different" the task would be, but rather the notion that a state court can be deemed to have unreasonably applied federal law to evidence it did not even know existed. We cannot comprehend how exactly a state court would have any control over its application of law to matters beyond its knowledge. Adopting JUSTICE SOTOMAYOR's approach would not take seriously AEDPA's requirement that federal courts defer to state-court decisions and would effectively treat the statute as no more than a "'mood' that the Federal Judiciary must respect," *Terry Williams*, 529 U. S., at 386

Our recent decision in *Schriro* v. *Landrigan*, 550 U. S. 465 (2007), is consistent as well with our holding here. We explained that "[b]ecause the deferential standards prescribed by §2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.,* at 474. In practical effect, we went on to note, this means that when the state-court record "precludes habeas relief" under the limitations of §2254(d), a district court is "not required to hold an evidentiary hearing." *Id.,* at 474 (citing with approval the Ninth Circuit's recognition that "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record" (internal quotation marks omitted)).

The Court of Appeals wrongly interpreted *Williams* v. *Taylor*, 529 U. S. 420 (2000) *(Michael Williams)*, as supporting the contrary view. The question there was whether the lower court had correctly determined that §2254(e)(2) barred the petitioner's request for a federal evidentiary hearing.[4] *Michael Williams* did not concern whether evidence introduced in such a hearing could be considered under §2254(d)(1). In fact, only one claim at issue in that case was even subject to §2254(d); the rest had not been adjudicated on the merits in state-court proceedings. See *id.,* at 429 ("Petitioner did not develop, or raise, his claims . . . until he filed his federal habeas petition").[5]

————————

(opinion of Stevens, J.).

[4] If a prisoner has "failed to develop the factual basis of a claim in State court proceedings," §2254(e)(2) bars a federal court from holding an evidentiary hearing, unless the applicant meets certain statutory requirements.

[5] JUSTICE SOTOMAYOR's suggestion that *Michael Williams* "rejected" the conclusion here, see *post*, at 15, is thus quite puzzling. In the passage that she quotes, see *ibid.*, the Court merely explains that §2254(e)(2) should be interpreted in a way that does not preclude a state prisoner, who was diligent in state habeas court and who can

If anything, the decision in *Michael Williams* supports our holding. The lower court in that case had determined that the one claim subject to §2254(d)(1) did not satisfy that statutory requirement. In light of that ruling, this Court concluded that it was "unnecessary to reach the question whether §2254(e)(2) would permit a [federal] hearing on th[at] claim." *Id.,* at 444. That conclusion is fully consistent with our holding that evidence later introduced in federal court is irrelevant to §2254(d)(1) review.

The Court of Appeals' reliance on *Holland* v. *Jackson*, 542 U. S. 649 (2004) *(per curiam)*, was also mistaken. In *Holland*, we initially stated that "whether a state court's decision was unreasonable [under §2254(d)(1)] must be assessed in light of the record the court had before it." *Id.,* at 652. We then went on to *assume* for the sake of argument what some Courts of Appeals had held—that §2254(d)(1), despite its mandatory language, simply does not apply when a federal habeas court has admitted new evidence that supports a claim previously adjudicated in state court.[6] *Id.,* at 653. There was no reason to decide that question because regardless, the hearing should have been barred by §2254(e)(2). Today, we reject that assumption and hold that evidence introduced in federal court has no bearing on §2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of §2254(d)(1) on the record that was before that state court.[7]

_____

satisfy §2254(d), from receiving an evidentiary hearing.

[6] In *Bradshaw* v. *Richey*, 546 U. S. 74 (2005) *(per curiam)*, on which the Court of Appeals also relied, we made the same assumption. *Id.,* at 79–80 (discussing the State's "*Holland* argument").

[7] Pinholster and JUSTICE SOTOMAYOR place great weight on the fact that §2254(d)(2) includes the language "in light of the evidence presented in the State court proceeding," whereas §2254(d)(1) does not. See *post,* at 6–7. The additional clarity of §2254(d)(2) on this point, however, does not detract from our view that §2254(d)(1) also is plainly limited to the state-court record. The omission of clarifying language

## B

Pinholster's contention that our holding renders §2254(e)(2) superfluous is incorrect. Section 2254(e)(2) imposes a limitation on the discretion of federal habeas courts to take new evidence in an evidentiary hearing. See *Landrigan, supra,* at 473 (noting that district courts, under AEDPA, generally retain the discretion to grant an evidentiary hearing). Like §2254(d)(1), it carries out "AEDPA's goal of promoting comity, finality, and federalism by giving state courts the first opportunity to review [a] claim, and to correct any constitutional violation in the first instance." *Jimenez* v. *Quarterman*, 555 U. S. 113, ___ (2009) (slip op., at 8) (internal quotation marks omitted).[8]

Section 2254(e)(2) continues to have force where §2254(d)(1) does not bar federal habeas relief. For example, not all federal habeas claims by state prisoners fall within the scope of §2254(d), which applies only to claims "adjudicated on the merits in State court proceedings." At a minimum, therefore, §2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court. See, *e.g.*, *Michael Williams*, 529 U. S., at 427–429.[9]

Although state prisoners may sometimes submit new

---

from §2254(d)(1) just as likely reflects Congress' belief that such language was unnecessary as it does anything else.

[8] JUSTICE SOTOMAYOR's argument that §2254(d)(1) must be read in a way that "accommodates" §2254(e)(2), see *post*, at 9, rests on a fundamental misunderstanding of §2254(e)(2). The focus of that section is not on "preserving the opportunity" for hearings, *post*, at 9, but rather on *limiting* the discretion of federal district courts in holding hearings. We see no need in this case to address the proper application of §2254(e)(2). See n. 20, *infra*. But see *post*, at 12 (suggesting that we have given §2254(e)(2) "an unnaturally cramped reading").

[9] In all events, of course, the requirements of §§2254(a) through (c) remain significant limitations on the power of a federal court to grant habeas relief.

evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so. Provisions like §§2254(d)(1) and (e)(2) ensure that "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Id.,* at 437; see also *Richter*, 562 U. S., at ___ (slip op., at 13) ("Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions"); *Wainwright* v. *Sykes*, 433 U. S. 72, 90 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing").[10]

## C

Accordingly, we conclude that the Court of Appeals erred in considering the District Court evidence in its review under §2254(d)(1). Although we might ordinarily remand for a properly limited review, the Court of Appeals also ruled, in the alternative, that Pinholster merited habeas relief even on the state-court record alone. 590 F. 3d, at 669. Remand is therefore inappropriate, and we turn next to a review of the state-court record.

## III

The Court of Appeals' alternative holding was also erroneous. Pinholster has failed to demonstrate that the California Supreme Court unreasonably applied clearly established federal law to his penalty-phase ineffective-

---

[10] Though we do not decide where to draw the line between new claims and claims adjudicated on the merits, see n. 11, *infra*, JUSTICE SOTOMAYOR's hypothetical involving new evidence of withheld exculpatory witness statements, see *post*, at 9–10, may well present a new claim.

assistance claim on the state-court record. Section 2254(d) prohibits habeas relief.

## A

Section 2254(d) applies to Pinholster's claim because that claim was adjudicated on the merits in state-court proceedings. No party disputes that Pinholster's federal petition alleges an ineffective-assistance-of-counsel claim that had been included in both of Pinholster's state habeas petitions. The California Supreme Court denied each of those petitions "on the substantive ground that it is without merit."[11]

Section 2254(d) applies even where there has been a summary denial. See *Richter*, 562 U. S., at ___ (slip op., at 8). In these circumstances, Pinholster can satisfy the "unreasonable application" prong of §2254(d)(1) only by showing that "there was no reasonable basis" for the California Supreme Court's decision. *Id.,* at ___ (slip op., at 8). "[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or

_____

[11] The State does not contest that the *alleged* claim was adjudicated on the merits by the California Supreme Court, but it asserts that some of the evidence adduced in the federal evidentiary hearing fundamentally changed Pinholster's claim so as to render it effectively unadjudicated. See Brief for Petitioner 28–31; Reply Brief for Petitioner 4–5; Tr. of Oral Arg. 18. Pinholster disagrees and argues that the evidence adduced in the evidentiary hearing simply supports his alleged claim. Brief for Respondent 33–37.

We need not resolve this dispute because, even accepting Pinholster's position, he is not entitled to federal habeas relief. Pinholster has failed to show that the California Supreme Court unreasonably applied clearly established federal law on the record before that court, *infra*, at 18–23, 26–30, which brings our analysis to an end. Even if the evidence adduced in the District Court additionally supports his claim, as Pinholster contends, we are precluded from considering it. See n. 20, *infra.*

theories are inconsistent with the holding in a prior deci-
sion of this Court." *Id.,* at ___ (slip op., at 12). After a
thorough review of the state-court record,[12] we conclude
that Pinholster has failed to meet that high threshold.

B

There is no dispute that the clearly established federal
law here is *Strickland* v. *Washington*. In *Strickland*, this
Court made clear that "the purpose of the effective assis-
tance guarantee of the Sixth Amendment is not to improve
the quality of legal representation . . . [but] simply to

———————

[12] The parties agree that the state-court record includes both the
"allegations of [the] habeas corpus petition . . . and . . . 'any matter of
record pertaining to the case.'" *In re Hochberg*, 2 Cal. 3d 870, 874, n. 2,
471 P. 2d 1, 3–4, n. 2 (1970) (quoting Cal. Rule of Court 60), rejected on
another ground by *In re Fields*, 51 Cal. 3d 1063, 1070, n. 3, 800 P. 2d
862, 866, n. 3 (1990); see Reply Brief for Petitioner 16–17; Tr. of Oral
Arg. 45. Under California law, the California Supreme Court's sum-
mary denial of a habeas petition on the merits reflects that court's
determination that "the claims made in th[e] petition do not state a
prima facie case entitling the petitioner to relief." *In re Clark*, 5
Cal. 4th 750, 770, 855 P. 2d 729, 741–742 (1993). It appears that the
court generally assumes the allegations in the petition to be true, but
does not accept wholly conclusory allegations, *People* v. *Duvall*, 9
Cal. 4th 464, 474, 886 P. 2d 1252, 1258 (1995), and will also "review the
record of the trial . . . to assess the merits of the petitioner's claims,"
*Clark*, *supra,* at 770, 855 P. 2d, at 742.

The specific contents of the state-court record depend on which of the
two state habeas proceedings is at issue. One *amicus curiae* suggests
that both are at issue—that is, Pinholster must prove that *both* Cali-
fornia Supreme Court proceedings involved an unreasonable applica-
tion of law under §2254(d)(1). See Brief for Criminal Justice Legal
Foundation 26. By contrast, the most favorable approach for Pinholster
would be review of only the second state habeas proceeding, the record
of which includes all of the evidence that Pinholster ever submitted in
state habeas. We have not previously ruled on how to proceed in these
circumstances, and we need not do so here. Even taking the approach
most favorable to Pinholster, and reviewing only whether the California
Supreme Court was objectively unreasonable in the second state
habeas proceeding, we find that Pinholster has failed to satisfy
§2254(d)(1).

ensure that criminal defendants receive a fair trial." 466 U. S., at 689. Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct *so undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.,* at 686 (emphasis added). The Court acknowledged that "[t]here are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.,* at 689.

Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," *ibid.*, the Court established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id.,* at 690. To overcome that presumption, a defendant must show that counsel failed to act "reasonabl[y] considering all the circumstances." *Id.,* at 688. The Court cautioned that "[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges." *Id.,* at 690.

The Court also required that defendants prove prejudice. *Id.,* at 691–692. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.* That requires a "substantial," not just "conceivable," likelihood of a different result. *Richter*, 562 U. S., at \_\_\_ (slip op., at 22).

Our review of the California Supreme Court's decision is thus "doubly deferential." *Knowles* v. *Mirzayance*, 556 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 11) (citing *Yarborough* v. *Gentry*, 540 U. S. 1, 5–6 (2003) *(per curiam)*). We take a

"highly deferential" look at counsel's performance, *Strickland, supra,* at 689, through the "deferential lens of §2254(d)," *Mirzayance, supra,* at ___, n. 2 (slip op., at 9, n. 2). Pinholster must demonstrate that it was necessarily unreasonable for the California Supreme Court to conclude: (1) that he had not overcome the strong presumption of competence; and (2) that he had failed to undermine confidence in the jury's sentence of death.

## C

### 1

Pinholster has not shown that the California Supreme Court's decision that he could not demonstrate deficient performance by his trial counsel necessarily involved an unreasonable application of federal law. In arguing to the state court that his counsel performed deficiently, Pinholster contended that they should have pursued and presented additional evidence about: his family members and their criminal, mental, and substance abuse problems; his schooling; and his medical and mental health history, including his epileptic disorder. To support his allegation that his trial counsel had "no reasonable tactical basis" for the approach they took, Pinholster relied on statements his counsel made at trial. App. to Brief in Opposition 143. When arguing the motion to exclude the State's aggravating evidence at the penalty phase for failure to comply with Cal. Penal Code Ann. §190.3, Dettmar, one of Pinholster's counsel, contended that because the State did not provide notice, he "[was] not presently prepared to offer anything by way of mitigation," 52 Tr. 7250. In response to the trial court's inquiry as to whether a continuance might be helpful, Dettmar noted that the only mitigation witness he could think of was Pinholster's mother. Additional time, Dettmar stated, would not "make a great deal of difference." *Id.,* at 7257–7258.

We begin with the premise that "under the circum-

stances, the challenged action[s] might be considered sound trial strategy.'" *Strickland*, *supra,* at 689 (internal quotation marks omitted). The Court of Appeals dissent described one possible strategy:

> "[Pinholster's attorneys] were fully aware that they would have to deal with mitigation sometime during the course of the trial, did spend considerable time and effort investigating avenues for mitigation[,] and made a reasoned professional judgment that the best way to serve their client would be to rely on the fact that they never got [the required §190.3] notice and hope the judge would bar the state from putting on their aggravation witnesses." 590 F. 3d, at 701–702 (opinion of Kozinski, C. J.).

Further, if their motion was denied, counsel were prepared to present only Pinholster's mother in the penalty phase to create sympathy not for Pinholster, but for his mother. After all, the "'family sympathy'" mitigation defense was known to the defense bar in California at the time and had been used by other attorneys. *Id.,* at 707. Rather than displaying neglect, we presume that Dettmar's arguments were part of this trial strategy. See *Gentry*, *supra,* at 8 ("[T]here is a strong presumption that [counsel took certain actions] for tactical reasons rather than through sheer neglect" (citing *Strickland*, *supra,* at 690)).

The state-court record supports the idea that Pinholster's counsel acted strategically to get the prosecution's aggravation witnesses excluded for lack of notice, and if that failed, to put on Pinholster's mother. Other statements made during the argument regarding the motion to exclude suggest that defense counsel were trying to take advantage of a legal technicality and were not truly surprised. Brainard and Dettmar acknowledged that the prosecutor had invited them on numerous occasions to

review Pinholster's state prison file but argued that such an invitation did not meet with the "strict demands" of §190.3.  52 Tr. 7260.  Dettmar admitted that the prosecutor, "being as thorough as she is, possibly ha[d] met the requirement."  *Id.,* at 7250.  But if so, he wanted her "to make that representation to the court."[13]  *Ibid.*

Timesheets indicate that Pinholster's trial counsel investigated mitigating evidence.[14]  Long before the guilty verdict, Dettmar talked with Pinholster's mother and contacted a psychiatrist.[15]  On February 26, two months before the penalty phase started, he billed six hours for "[p]reparation argument, death penalty phase."  See Clerk's Tr. 864.  Brainard, who merely assisted Dettmar for the penalty phase, researched epilepsy and also interviewed Pinholster's mother.[16]  We know that Brainard likely spent additional time, not reflected in these entries, preparing Pinholster's brother, Terry, who provided some mitigation testimony about Pinholster's background dur-

---

[13] Counsel's argument was persuasive enough to cause the trial court to hold a hearing and take testimony before denying the motion to exclude.

[14] Both parties agree that these billing records were before the California Supreme Court.  See Tr. of Oral Arg. 45, 48–49.

[15] See Clerk's Tr. 798 (entry on Jan. 13 for "phone call to defendant's mother re medical history"); *id.,* at 864 (entries on Feb. 21 for "Penal Code research on capital punishment"; Feb. 23 for "conference with defendant's mother re childhood problems"; Feb. 25 for "Research on Pen. C. 190.3"; and Feb. 29 for "photocopying reports for appointed expert," "Preparation of Declaration and Order for appointment of psychiatrist," "Preparation order of visitation for investigator," and "Further research on Pen. C. 190.3").  The time records for Dettmar unfortunately stop with Mar. 14, so we do not know what he did during the critical weeks leading up to the penalty phase on May 1.

[16] See *id.,* at 869 (entries on Feb. 23 for "Conf. with Bernice Brasher, Pinholster's mother"; and Feb. 25 for "Research re; epilepsy and conf. with nurse"); *id.,* at 1160 (entries on Apr. 11 for "Start prep. for penalty phase"; Apr. 25 for "Prep. penalty phase and conf. with Mrs. Brashear"; and Apr. 26 for "Prep. penalty phase").

ing the guilt phase. *Infra*, at 28.

The record also shows that Pinholster's counsel confronted a challenging penalty phase with an unsympathetic client, which limited their feasible mitigation strategies. By the end of the guilt phase, the jury had observed Pinholster "glor[y]" in "his criminal disposition" and "hundreds of robberies." *Pinholster*, 1 Cal. 4th, at 945, 907, 824 P. 2d, at 611, 584. During his cross-examination, Pinholster laughed or smirked when he told the jury that his "occupation" was "a crook," when he was asked whether he had threatened a potential witness, and when he described thwarting police efforts to recover a gun he had once used. 44 Tr. 6225. He bragged about being a "professional robber." 43 *id.,* at 6204. To support his defense, Pinholster claimed that he used only guns—not knives—to commit his crimes. But during cross-examination, Pinholster admitted that he had previously been convicted of using a knife in a kidnaping. Pinholster also said he was a white supremacist and that he frequently carved swastikas into other people's property as "a sideline to robbery." 44 *id.,* at 6246.

Trial counsel's psychiatric expert, Dr. Stalberg, had concluded that Pinholster showed no significant signs or symptoms of mental disorder or defect other than his "psychopathic personality traits." App. 131. Dr. Stalberg was aware of Pinholster's hyperactivity as a youngster, hospitalization at age 14 for incorrigibility, alleged epileptic disorder, and history of drug dependency. Nevertheless, Dr. Stalberg told counsel that Pinholster did not appear to suffer from brain damage, was not significantly intoxicated or impaired on the night in question, and did not have an impaired ability to appreciate the criminality of his conduct.

Given these impediments, it would have been a reasonable penalty-phase strategy to focus on evoking sympathy for Pinholster's mother. In fact, such a family sympathy

defense is precisely how the State understood defense counsel's strategy. The prosecutor carefully opened her cross-examination of Pinholster's mother with, "I hope you understand I don't enjoy cross-examining a mother of anybody." 52 Tr. 7407. And in her closing argument, the prosecutor attempted to undercut defense counsel's strategy by pointing out, "Even the most heinous person born, even Adolph Hitler[,] probably had a mother who loved him." 53 *id.,* at 7452.

Pinholster's only response to this evidence is a series of declarations from Brainard submitted with Pinholster's first state habeas petition, seven years after the trial. Brainard declares that he has "no recollection" of interviewing any family members (other than Pinholster's mother) regarding penalty-phase testimony, of attempting to secure Pinholster's school or medical records, or of interviewing any former teachers or counselors. Pet. for Writ of Habeas Corpus in No. S004616 (Cal.), Exh. 3. Brainard also declares that Dettmar was primarily responsible for mental health issues in the case, but he has "no recollection" of Dettmar ever having secured Pinholster's medical records. *Id.,* Exh. 2. Dettmar neither confirmed nor denied Brainard's statements, as he had died by the time of the first state habeas petition. 590 F. 3d, at 700 (Kozinski, C. J., dissenting).

In sum, Brainard and Dettmar made statements suggesting that they were not surprised that the State intended to put on aggravating evidence, billing records show that they spent time investigating mitigating evidence, and the record demonstrates that they represented a psychotic client whose performance at trial hardly endeared him to the jury. Pinholster has responded to this evidence with only a handful of *post-hoc* nondenials by one of his lawyers. The California Supreme Court could have reasonably concluded that Pinholster had failed to rebut the presumption of competence mandated by *Strickland*—

here, that counsel had adequately performed at the penalty phase of trial.

2

The Court of Appeals held that the California Supreme Court had unreasonably applied *Strickland* because Pinholster's attorneys "w[ere] far more deficient than . . . the attorneys in *Terry Williams*, *Wiggins* [v. *Smith*, 539 U. S. 510 (2003)], and *Rompilla* [v. *Beard*, 545 U. S. 374 (2005)], where in each case the Supreme Court upheld the petitioner's ineffective assistance claim." 590 F. 3d, at 671. The court drew from those cases a "constitutional duty to investigate," *id.,* at 674, and the principle that "[i]t is prima facie ineffective assistance for counsel to 'abandon[ ] their investigation of [the] petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources,'" *ibid.* (quoting *Wiggins* v. *Smith*, 539 U. S. 510, 524–525 (2003)). The court explained that it could not "lightly disregard" a failure to introduce evidence of "excruciating life history" or "nightmarish childhood." 590 F. 3d*,* at 684 (internal quotation marks omitted).

The Court of Appeals misapplied *Strickland* and overlooked "the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions." 466 U. S., at 689*.* Beyond the general requirement of reasonableness, "specific guidelines are not appropriate." *Id.,* at 688. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions . . . ." *Id.,* at 688–689. *Strickland* itself rejected the notion that the same investigation will be required in every case. *Id.,* at 691 ("[C]ounsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary" (emphasis added)). It

is "[r]are" that constitutionally competent representation will require "any one technique or approach." *Richter*, 562 U. S., at ___ (slip op., at 17). The Court of Appeals erred in attributing strict rules to this Court's recent case law.[17]

Nor did the Court of Appeals properly apply the strong presumption of competence that *Strickland* mandates. The court dismissed the dissent's application of the presumption as "fabricat[ing] an excuse that the attorneys themselves could not conjure up." 590 F. 3d, at 673. But *Strickland* specifically commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." 466 U. S*.,* at 689–690. The Court of Appeals was required not simply to "give [the] attorneys the benefit of the doubt," 590 F. 3d, at 673, but to affirmatively entertain the range of possible "reasons Pinholster's counsel may have had for proceeding as they did," *id.,* at 692 (Kozinski, C. J., dissenting). See also *Richter*, *supra*, at ___ (slip op., at 20) ("*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

JUSTICE SOTOMAYOR questions whether it would have been a reasonable professional judgment for Pinholster's trial counsel to adopt a family-sympathy mitigation defense. *Post*, at 27. She cites no evidence, however, that such an approach would have been inconsistent with the standard of professional competence in capital cases that prevailed in Los Angeles in 1984. Indeed, she does not contest that, at the time, the defense bar in California had been using that strategy. See *supra*, at 19; *post*, at 28, n. 21. JUSTICE SOTOMAYOR relies heavily on *Wiggins*, but

---

[17] The Court of Appeals was not necessarily wrong in looking to other precedents of this Court for guidance, but "the *Strickland* test 'of necessity requires a case-by-case examination of the evidence.'" *Terry Williams*, 529 U. S. 362, 391 (2000) (quoting *Wright* v. *West*, 505 U. S. 277, 308 (1992) (KENNEDY, J., concurring in judgment)).

in that case the defendant's trial counsel specifically ac-
knowledged a standard practice for capital cases in Mary-
land that was inconsistent with what he had done. 539
U. S., at 524.

At bottom, JUSTICE SOTOMAYOR's view is grounded in
little more than her own sense of "prudence," *post*, at 26
(internal quotation marks omitted), and what appears to
be her belief that the only reasonable mitigation strategy
in capital cases is to "help" the jury "understand" the
defendant, *post,* at 35. According to JUSTICE SOTOMAYOR,
that Pinholster was an unsympathetic client "com-
pound[ed], rather than excuse[d], counsel's deficiency" in
pursuing further evidence "that could explain why Pinhol-
ster was the way he was." *Post*, at 30. But it certainly can
be reasonable for attorneys to conclude that creating
sympathy for the defendant's *family* is a better idea be-
cause the defendant himself is simply unsympathetic.

JUSTICE SOTOMAYOR's approach is flatly inconsistent
with *Strickland*'s recognition that "[t]here are countless
ways to provide effective assistance in any given case."
466 U. S., at 689. There comes a point where a defense
attorney will reasonably decide that another strategy is in
order, thus "mak[ing] particular investigations unneces-
sary." *Id.,* at 691; cf. 590 F. 3d, at 692 (Kozinski, C. J.,
dissenting) ("The current infatuation with 'humanizing'
the defendant as the be-all and end-all of mitigation disre-
gards the possibility that this may be the wrong tactic in
some cases because experienced lawyers conclude that the
jury simply won't buy it"). Those decisions are due "a
heavy measure of deference." *Strickland, supra,* at 691.
The California Supreme Court could have reasonably
concluded that Pinholster's counsel made such a reasoned
decision in this case.

We have recently reiterated that "'[s]urmounting *Strick-
land*'s high bar is never an easy task.'" *Richter, supra*, at
\_\_\_ (slip op., at 15) (quoting *Padilla* v. *Kentucky*, 559 U. S.

___, ___ (2010) (slip op., at 14)). The *Strickland* standard must be applied with "scrupulous care." *Richter*, *supra*, at ___ (slip op., at 15). The Court of Appeals did not do so here.

D

Even if his trial counsel had performed deficiently, Pinholster also has failed to show that the California Supreme Court must have unreasonably concluded that Pinholster was not prejudiced. "[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, *supra,* at 695. We therefore "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, *supra,* at 534.

1

We turn first to the aggravating and mitigating evidence that the sentencing jury considered. See *Strickland*, *supra,* at 695 ("[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury"). Here, the same jury heard both the guilt and penalty phases and was instructed to consider all the evidence presented. Cf. *Visciotti*, 537 U. S., at 25 (noting that the state habeas court had correctly considered mitigating evidence introduced during the guilt phase).

The State presented extensive aggravating evidence. As we have already discussed, the jury watched Pinholster revel in his extensive criminal history. *Supra*, at 21. Then, during the penalty phase, the State presented evidence that Pinholster had threatened to kill the State's lead witness, assaulted a man with a straight razor, and kidnaped another person with a knife. The State showed that Pinholster had a history of violent outbursts, including striking and threatening a bailiff after a court proceed-

ing at age 17, breaking his wife's jaw,[18] resisting arrest by faking seizures, and assaulting and spitting on police officers. The jury also heard about Pinholster's involvement in juvenile gangs and his substantial disciplinary record in both county and state jails, where he had threatened, assaulted, and thrown urine at guards, and fought with other inmates. While in jail, Pinholster had been segregated for a time due to his propensity for violence and placed on a "special disciplinary diet" reserved only for the most disruptive inmates. 52 Tr. 7305.

The mitigating evidence consisted primarily of the penalty-phase testimony of Pinholster's mother, Brashear, who gave a detailed account of Pinholster's troubled childhood and adolescence. Early childhood was quite difficult. The family "didn't have lots of money." *Id.,* at 7404. When he was very young, Pinholster suffered two serious head injuries, first at age 2 or 3 when he was run over by a car, and again at age 4 or 5 when he went through the windshield during a car accident. When he was 5, Pinholster's stepfather moved in and was abusive, or nearly so.

Pinholster always struggled in school. He was disruptive in kindergarten and was failing by first grade. He got in fights and would run out of the classroom. In third grade, Pinholster's teacher suggested that he was more than just a "'disruptive child.'" *Id.,* at 7394. Following tests at a clinic, Pinholster was sent to a school for educationally handicapped children where his performance improved.

At age 10, psychiatrists recommended that Pinholster be sent to a mental institution, although he did not go. Pinholster had continued to initiate fights with his brothers and to act like "Robin Hood" around the neighborhood,

––––––––

[18] Pinholster's wife waived her spousal privilege to testify to this fact. She acknowledged that her testimony would be used to argue that her husband should be executed.

"[s]tealing from the rich and giving to the poor." *Id.,* at 7395. Brashear had thought then that "[s]omething was not working right." *Id.,* at 7396.

By age 10 or 11, Pinholster was living in boy's homes and juvenile halls. He spent six months when he was 12 in a state mental institution for emotionally handicapped children. By the time he was 18, Pinholster was in county jail, where he was beaten badly. Brashear suspected that the beating caused Pinholster's epilepsy, for which he has been prescribed medication. After a stint in state prison, Pinholster returned home but acted "unusual" and had trouble readjusting to life. *Id.,* at 7405.

Pinholster's siblings were "basically very good children," although they would get into trouble. *Id.,* at 7401. His brother, Terry, had been arrested for drunk driving and his sister, Tammy, for public intoxication. Tammy also was arrested for drug possession and was self-destructive and "wild." *Ibid.* Pinholster's eldest brother, Alvin, died a fugitive from California authorities.[19]

In addition to Brashear's penalty-phase testimony, Pinholster had previously presented mitigating evidence during the guilt phase from his brother, Terry. Terry testified that Pinholster was "more or less in institutions all his life," suffered from epilepsy, and was "more or less" drunk on the night of the murders. 42 *id.,* at 6015, 6036.

After considering this aggravating and mitigating evidence, the jury returned a sentence of death. The state

---

[19] JUSTICE SOTOMAYOR criticizes Brashear's testimony as "self-interested," *post*, at 31, but the whole premise of the family-sympathy defense is *the family's interest*. She similarly makes much of the fact that the prosecutor "belittle[d]" Brashear's testimony in closing argument. *Post*, at 33. We fail to see the point. Any diligent prosecutor would have challenged whatever mitigating evidence the defense had put on. And, we would certainly not expect the prosecutor's closing argument to have described the evidence in the light most favorable to Pinholster. But see *ibid.*, n. 26.

trial court found that the jury's determination was "supported overwhelmingly by the weight of the evidence" and added that "the factors in aggravation beyond all reasonable doubt outweigh those in mitigation." Clerk's Tr. 1184, 1186.

2

There is no reasonable probability that the additional evidence Pinholster presented in his state habeas proceedings would have changed the jury's verdict. The "new" evidence largely duplicated the mitigation evidence at trial. School and medical records basically substantiate the testimony of Pinholster's mother and brother. Declarations from Pinholster's siblings support his mother's testimony that his stepfather was abusive and explain that Pinholster was beaten with fists, belts, and even wooden boards.

To the extent the state habeas record includes new factual allegations or evidence, much of it is of questionable mitigating value. If Pinholster had called Dr. Woods to testify consistently with his psychiatric report, Pinholster would have opened the door to rebuttal by a state expert. See, *e.g., Wong* v. *Belmontes*, 558 U. S. \_\_\_, \_\_\_ (2009) *(per curiam)* (slip op., at 10–12) (taking into account that certain mitigating evidence would have exposed the petitioner to further aggravating evidence). The new evidence relating to Pinholster's family—their more serious substance abuse, mental illness, and criminal problems, see *post*, at 22—is also by no means clearly mitigating, as the jury might have concluded that Pinholster was simply beyond rehabilitation. Cf. *Atkins* v. *Virginia*, 536 U. S. 304, 321 (2002) (recognizing that mitigating evidence can be a "two-edged sword" that juries might find to show future dangerousness).

The remaining new material in the state habeas record is sparse. We learn that Pinholster's brother Alvin died of

suicide by drug overdose, and there are passing references to Pinholster's own drug dependency. According to Dr. Stalberg, Pinholster's "school records" apparently evidenced "some degree" of brain damage. App. to Brief in Opposition 219. Mostly, there are just a few new details about Pinholster's childhood. Pinholster apparently looked like his biological father, whom his grandparents "loathed." Pet. for Writ of Habeas Corpus in No. S004616 (Cal.), Exh. 98, p. 1. Accordingly, whenever his grandparents "spanked or disciplined" the kids, Pinholster "always got the worst of it." *Ibid.* Pinholster was mostly unsupervised and "didn't get much love," because his mother and stepfather were always working and "were more concerned with their own lives than the welfare of their kids." *Id.,* at 2. Neither parent seemed concerned about Pinholster's schooling. Finally, Pinholster's aunt once saw the children mixing flour and water to make something to eat, although "[m]ost meals consisted of canned spaghetti and foods of that ilk." *Id.,* at 1.

Given what little additional mitigating evidence Pinholster presented in state habeas, we cannot say that the California Supreme Court's determination was unreasonable. Having already heard much of what is included in the state habeas record, the jury returned a sentence of death. Moreover, some of the new testimony would likely have undercut the mitigating value of the testimony by Pinholster's mother. The new material is thus not so significant that, even assuming Pinholster's trial counsel performed deficiently, it was necessarily unreasonable for the California Supreme Court to conclude that Pinholster had failed to show a "substantial" likelihood of a different sentence. *Richter*, 562 U. S., at ___ (slip op., at 22) (citing *Strickland*, 466 U. S., at 693).

3

As with deficiency, the Court of Appeals found this case

to be "materially indistinguishable" from *Terry Williams* and *Rompilla* v. *Beard*, 545 U. S. 374 (2005). 590 F. 3d, at 684. But this Court did not apply AEDPA deference to the question of prejudice in those cases; each of them lack the important "doubly deferential" standard of *Strickland* and AEDPA. See *Terry Williams*, 529 U. S., at 395–397 (reviewing a state-court decision that did not apply the correct legal standard); *Rompilla*, *supra,* at 390 (reviewing *Strickland* prejudice *de novo* because the state-court decision did not reach the question). Those cases therefore offer no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking. We have said time and again that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, *supra*, at \_\_\_ (slip op., at 11) (internal quotation marks omitted). Even if the Court of Appeals might have reached a different conclusion as an initial matter, it was not an unreasonable application of our precedent for the California Supreme Court to conclude that Pinholster did not establish prejudice.[20]

\*    \*    \*

The judgment of the United States Court of Appeals for the Ninth Circuit is reversed.

*It is so ordered.*

---

[20] Because Pinholster has failed to demonstrate that the adjudication of his claim based on the state-court record resulted in a decision "contrary to" or "involv[ing] an unreasonable application" of federal law, a writ of habeas corpus "shall not be granted" and our analysis is at an end. 28 U. S. C. §2254(d). We are barred from considering the evidence Pinholster submitted in the District Court that he contends additionally supports his claim. For that reason, we need not decide whether §2254(e)(2) prohibited the District Court from holding the evidentiary hearing or whether a district court may ever choose to hold an evidentiary hearing before it determines that §2254(d) has been satisfied.

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–1088

_____

## VINCENT CULLEN, ACTING WARDEN, PETITIONER *v.* SCOTT LYNN PINHOLSTER

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 4, 2011]

JUSTICE ALITO, concurring in part and concurring in the judgment.

Although I concur in the Court's judgment, I agree with the conclusion reached in Part I of the dissent, namely, that, when an evidentiary hearing is properly held in federal court, review under 28 U. S. C. §2254(d)(1) must take into account the evidence admitted at that hearing. As the dissent points out, refusing to consider the evidence received in the hearing in federal court gives §2254(e)(2) an implausibly narrow scope and will lead either to results that Congress surely did not intend or to the distortion of other provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, and the law on "cause and prejudice." See *post*, at 9–12 (opinion of SOTOMAYOR, J.).

Under AEDPA evidentiary hearings in federal court should be rare. The petitioner generally must have made a diligent effort to produce in state court the new evidence on which he seeks to rely. See §2254(e)(2); *Williams* v. *Taylor*, 529 U. S. 420, 433–434 (2000). If that requirement is not satisfied, the petitioner may establish the factual predicate for a claim in a federal-court hearing only if, among other things, "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder

would have found the applicant guilty of the underlying offense." §2254(e)(2)(B).

Even when the petitioner does satisfy the diligence standard adopted in *Williams* v. *Taylor*, *supra*, a hearing should not be held in federal court unless the new evidence that the petitioner seeks to introduce was not and could not have been offered in the state-court proceeding. Section 2254(e)(2) bars a hearing in certain situations, but it does not mean that a hearing is allowed in all other situations. See *Schriro* v. *Landrigan*, 550 U. S. 465, 473–474 (2007). The whole thrust of AEDPA is essentially to reserve federal habeas relief for those cases in which the state courts acted unreasonably. See §§2254(d)(1), (2), (e)(1). Permitting a petitioner to obtain federal habeas relief on the basis of evidence that could have been but was not offered in state court would upset this scheme.

In this case, for essentially the reasons set out in the dissent from the Court of Appeals' en banc decision, see *Pinholster* v. *Ayers*, 590 F. 3d 651, 688–691 (CA9 2009) (opinion of Kozinski, J.), I would hold that the federal-court hearing should not have been held because respondent did not diligently present his new evidence to the California courts. And I join all but Part II of the opinion of the Court, as I agree that the decision of the state court represented a reasonable application of clearly established Supreme Court precedent in light of the state-court record.

# SUPREME COURT OF THE UNITED STATES

No. 09–1088

VINCENT CULLEN, ACTING WARDEN, PETITIONER
*v.* SCOTT LYNN PINHOLSTER

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 4, 2011]

JUSTICE BREYER, concurring in part and dissenting in part.

I join Parts I and II of the Court's opinion. I do not join Part III, for I would send this case back to the Court of Appeals so that it can apply the legal standards that Part II announces to the complex facts of this case. Compare *ante*, at 14–31 (majority opinion), with *post*, at 17–42 (SOTOMAYOR, J., dissenting).

Like the Court, I believe that its understanding of 28 U. S. C. §2254(d)(1) does not leave AEDPA's hearing section, §2254(e), without work to do. An offender who believes he is entitled to habeas relief must first present a claim (including his evidence) to the state courts. If the state courts reject the claim, then a federal habeas court may review that rejection on the basis of the materials considered by the state court. If the federal habeas court finds that the state-court decision fails (d)'s test (or if (d) does not apply), then an (e) hearing may be needed.

For example, if the state-court rejection assumed the habeas petitioner's facts (deciding that, *even if* those facts were true, federal law was not violated), then (after finding the state court wrong on a (d) ground) an (e) hearing might be needed to determine whether the facts alleged were indeed true. Or if the state-court rejection rested on a state ground, which a federal habeas court found inade-

quate, then an (e) hearing might be needed to consider the petitioner's (now unblocked) substantive federal claim. Or if the state-court rejection rested on only one of several related federal grounds (*e.g.*, that counsel's assistance was not "inadequate"), then, if the federal court found that the state court's decision in respect to the ground it decided violated (d), an (e) hearing might be needed to consider other related parts of the whole constitutional claim (*e.g.*, whether the counsel's "inadequate" assistance was also prejudicial). There may be other situations in which an (e) hearing is needed as well.

In this case, however, we cannot say whether an (e) hearing is needed until we know whether the state court, in rejecting Pinholster's claim on the basis presented to that state court, violated (d). (In my view, the lower courts' analysis in respect to this matter is inadequate.)

There is no role in (d) analysis for a habeas petitioner to introduce evidence that was not first presented to the state courts. But that does not mean that Pinholster is without recourse to present new evidence. He can always return to state court presenting new evidence not previously presented. If the state court again denies relief, he might be able to return to federal court to make claims related to the latest rejection, subject to AEDPA's limitations on successive petitions. See §2244.

I am not trying to predict the future course of these proceedings. I point out only that, in my view, AEDPA is not designed to take necessary remedies from a habeas petitioner but to give the State a first opportunity to consider most matters and to insist that federal courts properly respect state-court determinations.

# SUPREME COURT OF THE UNITED STATES

No. 09–1088

VINCENT CULLEN, ACTING WARDEN, PETITIONER
*v.* SCOTT LYNN PINHOLSTER

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 4, 2011]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG
and JUSTICE KAGAN join as to Part II, dissenting.

Some habeas petitioners are unable to develop the fac-
tual basis of their claims in state court through no fault
of their own. Congress recognized as much when it en-
acted the Antiterrorism and Effective Death Penalty Act of
1996 (AEDPA), 110 Stat. 1214, and permitted therein the
introduction of new evidence in federal habeas proceed-
ings in certain limited circumstances. See 28 U. S. C.
§2254(e)(2). Under the Court's novel interpretation of
§2254(d)(1), however, federal courts must turn a blind eye
to new evidence in deciding whether a petitioner has
satisfied §2254(d)(1)'s threshold obstacle to federal habeas
relief—even when it is clear that the petitioner would be
entitled to relief in light of that evidence. In reading
the statute to "compe[l]" this harsh result, *ante*, at 9,
the Court ignores a key textual difference between
§§2254(d)(1) and 2254(d)(2) and discards the previous
understanding in our precedents that new evidence can, in
fact, inform the §2254(d)(1) inquiry. I therefore dissent
from the Court's first holding.

I also disagree with the Court that, even if the
§2254(d)(1) analysis is limited to the state-court record,
respondent Scott Pinholster failed to demonstrate that the
California Supreme Court's decision denying his ineffec-

tive-assistance-of-counsel claim was an unreasonable application of *Strickland* v. *Washington*, 466 U. S. 668 (1984). There is no reason for the majority to decide whether the §2254(d)(1) analysis is limited to the state-court record because Pinholster satisfied §2254(d)(1) on either the state- or federal-court record.

I

The Court first holds that, in determining whether a state-court decision is an unreasonable application of Supreme Court precedent under §2254(d)(1), "review . . . is limited to the record that was before the state court that adjudicated the claim on the merits." *Ante*, at 9. New evidence adduced at a federal evidentiary hearing is now irrelevant to determining whether a petitioner has satisfied §2254(d)(1). This holding is unnecessary to promote AEDPA's purposes, and it is inconsistent with the provision's text, the structure of the statute, and our precedents.

A

To understand the significance of the majority's holding, it is important to view the issue in context. AEDPA's entire structure—which gives state courts the opportunity to decide factual and legal questions in the first instance— ensures that evidentiary hearings in federal habeas proceedings are very rare. See N. King, F. Cheesman, & B. Ostrom, Final Technical Report: Habeas Litigation in U. S. District Courts 35–36 (2007) (evidentiary hearings under AEDPA occur in 0.4 percent of noncapital cases and 9.5 percent of capital cases). Even absent the new restriction created by today's holding, AEDPA erects multiple hurdles to a state prisoner's ability to introduce new evidence in a federal habeas proceeding.

First, "[u]nder the exhaustion requirement, a habeas petitioner challenging a state conviction must first at-

tempt to present his claim in state court." *Harrington* v. *Richter*, 562 U. S. ___, ___ (2011) (slip op., at 13); see also §2254(b)(1)(A). With certain narrow exceptions, federal courts cannot consider a claim at all, let alone accept new evidence relevant to the claim, if it has not been exhausted in state court.[1] The exhaustion requirement thus reserves to state courts the first opportunity to resolve factual disputes relevant to a state prisoner's claim. See *O'Sullivan* v. *Boerckel*, 526 U. S. 838, 845 (1999).

Second, the exhaustion requirement is "complement[ed]" by the standards set forth in §2254(d). *Harrington*, 562 U. S., at ___ (slip op., at 14). Under this provision, a federal court may not grant habeas relief on any "claim that was adjudicated on the merits in State court proceedings" unless the adjudication

> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

These standards "control whether to grant habeas relief." *Schriro* v. *Landrigan*, 550 U. S. 465, 474 (2007). Accordingly, we have said, if the factual allegations a petitioner seeks to prove at an evidentiary hearing would not satisfy these standards, there is no reason for a hearing. See *id.*, at 481. In such a case, the district court may exercise its "discretion to deny an evidentiary hearing." *Ibid.;* see also *infra*, at 13–14. This approach makes eminent sense: If district courts held evidentiary hearings without first

---

[1] Relatedly, a state prisoner must, as a general matter, properly exhaust his federal claims in state court to avoid having his claim defaulted on procedural grounds. See *Coleman* v. *Thompson*, 501 U. S. 722, 750 (1991).

asking whether the evidence the petitioner seeks to present would satisfy AEDPA's demanding standards, they would needlessly prolong federal habeas proceedings.

Third, even when a petitioner seeks to introduce new evidence that would entitle him to relief, AEDPA prohibits him from doing so, except in a narrow range of cases, unless he "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams* v. *Taylor*, 529 U. S. 420, 435 (2000) *(Michael Williams)*. Thus, §2254(e)(2) provides:

> "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>     "(A) the claim relies on—
>     "(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>     "(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>     "(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

In *Michael Williams*, we construed the opening clause of this provision—which triggers the bar on evidentiary hearings—to apply when "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."[2] *Id.*, at 432. AEDPA thus bars an

---

[2] Section 2254(e)(2) also governs an attempt to obtain relief "based on new evidence without an evidentiary hearing." *Holland* v. *Jackson*, 542 U. S. 649, 653 (2004) *(per curiam)* (emphasis deleted).

evidentiary hearing for a nondiligent petitioner unless the petitioner can satisfy both §§2254(e)(2)(A) and (B), which few petitioners can. Section 2254(e)(2) in this way incentivizes state petitioners to develop the factual basis of their claims in state court.

To the limited extent that federal evidentiary hearings are available under AEDPA, they ensure that petitioners who diligently developed the factual basis of their claims in state court, discovered new evidence after the state-court proceeding, and cannot return to state court retain the ability to access the Great Writ. See *ante*, at 2 (ALITO, J., concurring in part and concurring in judgment). "When Congress codified new rules governing this previously judicially managed area of law, it did so without losing sight of the fact that the 'writ of habeas corpus plays a vital role in protecting constitutional rights.'" *Holland* v. *Florida*, 560 U. S. ___, ___ (2010) (slip op., at 16) (quoting *Slack* v. *McDaniel*, 529 U. S. 473, 483 (2000)). Allowing a petitioner to introduce new evidence at a hearing in the limited circumstance permitted by §2254(e)(2) does not upset the balance that Congress struck in AEDPA between the state and federal courts. By construing §2254(d)(1) to do the work of other provisions in AEDPA, the majority has subverted Congress' careful balance of responsibilities. It has also created unnecessarily a brand-new set of procedural complexities that lower courts will have to confront.[3]

## B

The majority's interpretation of §2254(d)(1) finds no support in the provision's text or the statute's structure as a whole.

### 1

Section 2254(d)(1) requires district courts to ask

_____

[3] See, *e.g.*, nn. 5, 7, and 13, *infra.*

whether a state-court adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Because this provision uses "backward-looking language"—*i.e.*, past-tense verbs—the majority believes that it limits review to the state-court record. *Ante*, at 9. But both §§2254(d)(1) and 2254(d)(2) use "backward-looking language," and §2254(d)(2)—unlike §2254(d)(1)—expressly directs district courts to base their review on "the evidence presented in the State court proceeding." If use of the past tense were sufficient to indicate Congress' intent to restrict analysis to the state-court record, the phrase "in light of the evidence presented in the State court proceeding" in §2254(d)(2) would be superfluous. The majority's construction of §2254(d)(1) fails to give meaning to Congress' decision to include language referring to the evidence presented to the state court in §2254(d)(2). Cf. *Bates* v. *United States*, 522 U. S. 23, 29–30 (1997) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (internal quotation marks and brackets omitted)).

Ignoring our usual "reluctan[ce] to treat statutory terms as surplusage in any setting," *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001) (internal quotation marks omitted), the majority characterizes the phrase appearing in §2254(d)(2) as mere "clarifying language," *ante*, at 12, n. 7. It speculates that "[t]he omission of clarifying language from §2254(d)(1) just as likely reflects Congress' belief that such language was unnecessary as it does anything else." *Ante*, at 12–13, n. 7. The argument that this phrase is merely "clarifying" might have more force, however, had Congress included this phrase in §2254(d)(1) but not in §2254(d)(2). As between the two provisions, §2254(d)(2)—which re-

quires review of the state court's "determination of the facts"—more logically depends on the facts presented to the state court. Because this provision needs less clarification on this point than §2254(d)(1), it is all the more telling that Congress included this phrase in §2254(d)(2) but elected to exclude it from §2254(d)(1).

Unlike my colleagues in the majority, I refuse to assume that Congress simply engaged in sloppy drafting. The inclusion of this phrase in §2254(d)(2)—coupled with its omission from §2254(d)(2)'s partner provision, §2254(d)(1)—provides strong reason to think that Congress did not intend for the §2254(d)(1) analysis to be limited categorically to "the evidence presented in the State court proceeding."

2

The "'broader context of the statute as a whole,'" *ante*, at 9 (quoting *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 341 (1997)), reinforces this conclusion. In particular, Congress' decision to include in AEDPA a provision, §2254(e)(2), that permits federal evidentiary hearings in certain circumstances provides further evidence that Congress did not intend to limit the §2254(d)(1) inquiry to the state-court record in every case.

We have long recognized that some diligent habeas petitioners are unable to develop all of the facts supporting their claims in state court.[4] As discussed above, in

———————

[4] See, *e.g.*, *Michael Williams*, 529 U. S. 420, 432 (2000) (noting that diligent efforts to develop the facts might be "thwarted, for example, by the conduct of another or by happenstance"); *id.*, at 434 (noting that the prosecution might have "concealed the facts" supporting "a claim which was pursued with diligence"); *Townsend* v. *Sain*, 372 U. S. 293, 313 (1963) (requiring federal courts to grant evidentiary hearings when, *inter alia*, "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing" or "there is a substantial allegation of newly discovered evidence"), overruled in part on other grounds by *Keeney* v. *Tamayo-Reyes*, 504 U. S. 1, 5 (1992).

enacting AEDPA, Congress generally barred evidentiary hearings for petitioners who did not "exercise diligence in pursuing their claims" in state court. *Michael Williams*, 529 U. S., at 436; see also §2254(e)(2). Importantly, it did not impose any express limit on evidentiary hearings for petitioners who had been diligent in state court. See *id.*, at 436 ("[T]he statute does not equate prisoners who exercise diligence in pursuing their claims with those who do not"). For those petitioners, Congress left the decision to hold a hearing "to the sound discretion of district courts." *Landrigan*, 550 U. S., at 473.

Faced with situations in which a diligent petitioner offers additional evidence in federal court, the courts of appeals have taken two approaches to applying §2254(d)(1). Some courts have held that when a federal court admits new evidence supporting a claim adjudicated on the merits in state court, §2254(d)(1) does not apply at all and the federal court may review the claim *de novo*. See *ante*, at 12; *Holland* v. *Jackson*, 542 U. S. 649, 653 (2004) *(per curiam);* see, *e.g.*, *Winston* v. *Kelly*, 592 F. 3d 535, 555–556 (CA4 2010). I agree with the majority's rejection of this approach. See *ante*, at 12. It would undermine the comity principles motivating AEDPA to decline to defer to a state-court adjudication of a claim because the state court, through no fault of its own, lacked all the relevant evidence.[5]

––––––––––

[5] Of course, §2254(d)(1) only applies when a state court has adjudicated a claim on the merits. There may be situations in which new evidence supporting a claim adjudicated on the merits gives rise to an altogether different claim. See, *e.g.*, Reply Brief for Petitioner 10–11 (evidence withheld by the prosecutor relating to one claim may give rise to a separate claim under *Brady* v. *Maryland*, 373 U. S. 83 (1963)). The majority opinion does not foreclose this possibility.

I assume that the majority does not intend to suggest that review is limited to the state-court record when a petitioner's inability to develop the facts supporting his claim was the fault of the state court itself. See generally Tr. of Oral Arg. in *Bell* v. *Kelly*, O. T. 2008, No. 07–1223.

Other courts of appeals, including the court below, have struck a more considered balance. These courts have held that §2254(d)(1) continues to apply but that new evidence properly presented in a federal hearing is relevant to the reasonableness of the state-court decision. See *Pinholster* v. *Ayers*, 590 F. 3d 651, 668 (CA9 2009) (en banc) ("If the evidence is admissible under *Michael Williams* or §2254(e)(2), and if it does not render the petitioner's claims unexhausted . . . , then it is properly considered in evaluating whether the legal conclusion reached by the state habeas court was a reasonable application of Supreme Court law"); accord, *Wilson* v. *Mazzuca*, 570 F. 3d 490, 500 (CA2 2009); *Pecoraro* v. *Walls*, 286 F. 3d 439, 443 (CA7 2002); *Valdez* v. *Cockrell*, 274 F. 3d 941, 952 (CA5 2001). This approach accommodates the competing goals, reflected in §§2254(d) and 2254(e)(2), of according deference to reasonable state-court decisions and preserving the opportunity for diligent petitioners to present evidence to the federal court when they were unable to do so in state court.

The majority charts a third, novel course that, so far as I am aware, no court of appeals has adopted: §2254(d)(1) continues to apply when a petitioner has additional evidence that he was unable to present to the state court, but the district court cannot consider that evidence in deciding whether the petitioner has satisfied §2254(d)(1). The problem with this approach is its potential to bar federal habeas relief for diligent habeas petitioners who cannot present new evidence to a state court.

Consider, for example, a petitioner who diligently attempted in state court to develop the factual basis of a claim that prosecutors withheld exculpatory witness statements in violation of *Brady* v. *Maryland*, 373 U. S. 83 (1963). The state court denied relief on the ground that the withheld evidence then known did not rise to the level of materiality required under *Brady*. Before the time for

filing a federal habeas petition has expired, however, a state court orders the State to disclose additional documents the petitioner had timely requested under the State's public records Act. The disclosed documents reveal that the State withheld other exculpatory witness statements, but state law would not permit the petitioner to present the new evidence in a successive petition.[6]

Under our precedent, if the petitioner had not presented his *Brady* claim to the state court at all, his claim would be deemed defaulted and the petitioner could attempt to show cause and prejudice to overcome the default. See *Michael Williams*, 529 U. S., at 444; see also n. 1, *supra.* If, however, the new evidence merely bolsters a *Brady* claim that was adjudicated on the merits in state court, it is unclear how the petitioner can obtain federal habeas relief after today's holding. What may have been a reasonable decision on the state-court record may no longer be reasonable in light of the new evidence. See *Kyles* v. *Whitley*, 514 U. S. 419, 436 (1995) (materiality of *Brady* evidence is viewed "collectively, not item by item"). Because the state court adjudicated the petitioner's *Brady* claim on the merits, §2254(d)(1) would still apply. Yet, under the majority's interpretation of §2254(d)(1), a federal court is now prohibited from considering the new evidence in determining the reasonableness of the state-court decision.

The majority's interpretation of §2254(d)(1) thus suggests the anomalous result that petitioners with new claims based on newly obtained evidence can obtain federal habeas relief if they can show cause and prejudice for their default but petitioners with newly obtained evidence supporting a claim adjudicated on the merits in state court

---

[6] See, *e.g., id.*, at 37–38 (statement by counsel for the respondent warden that Virginia law bars all successive habeas applications, even in cases where the petitioner has new evidence).

cannot obtain federal habeas relief if they cannot first satisfy §2254(d)(1) without the new evidence. That the majority's interpretation leads to this anomaly is good reason to conclude that its interpretation is wrong. See *Keeney* v. *Tamayo-Reyes*, 504 U. S. 1, 7–8 (1992) ("[I]t is . . . irrational to distinguish between failing to properly assert a federal claim in state court and failing in state court to properly develop such a claim").

The majority responds to this anomaly by suggesting that my hypothetical petitioner "may well [have] a new claim."[7] *Ante*, at 14, n. 10. This suggestion is puzzling. New evidence does not usually give rise to a new claim; it merely provides additional proof of a claim already adjudicated on the merits.[8] The majority presumably means to suggest that the petitioner might be able to obtain federal-court review of his new evidence if he can show cause and prejudice for his failure to present the "new" claim to a state court. In that scenario, however, the federal court would review the purportedly "new" claim *de novo*. The majority's approach thus threatens to replace deferential review of new evidence under §2254(d)(1) with *de novo* review of new evidence in the form of "new" claims.[9] Because it is unlikely that Congress intended *de novo* review—the result suggested by the majority's opinion—it must have intended for district courts to consider newly discovered evidence in conducting the §2254(d)(1) analysis.

—————

[7] The majority declines, however, to provide any guidance to the lower courts on how to distinguish claims adjudicated on the merits from new claims.

[8] Even if it can fairly be argued that my hypothetical petitioner has a new claim, the majority fails to explain how a diligent petitioner with new evidence supporting an existing claim can present his new evidence to a federal court.

[9] In this vein, it is the majority's approach that "would not take seriously AEDPA's requirement that federal courts defer to state-court decisions." *Ante*, at 10, n. 3.

The majority's reading of §2254(d)(1) appears ultimately to rest on its understanding that state courts must have the first opportunity to adjudicate habeas petitioners' claims.    See *ante*, at 9–10 ("It would be contrary to [AEDPA's exhaustion requirement] to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de *novo*").[10] JUSTICE BREYER takes the same position.  See *ante*, at 2 (opinion concurring in part and dissenting in part) (AEDPA is designed "to give the State a first opportunity to consider most matters").   I fully agree that habeas petitioners must attempt to present evidence to state courts in the first instance, as does JUSTICE ALITO, see *ante*, at 2.  Where I disagree with the majority is in my understanding that §2254(e)(2) already accomplishes this result.    By reading §2254(d)(1) to do the work of §2254(e)(2), the majority gives §2254(e)(2) an unnaturally cramped reading.   As a result, the majority either has foreclosed habeas relief for diligent petitioners who, through no fault of their own, were unable to present exculpatory evidence to the state court that adjudicated their claims or has created a new set of procedural complexities for the lower courts to navigate to ensure the availability of the Great Writ for diligent petitioners.

3

These considerations lead me to agree with the courts of appeals that have concluded that a federal court should assess the reasonableness of a state court's application of clearly established federal law under §2254(d)(1) in light of evidence properly admitted in a federal evidentiary hearing.   There is nothing "strange" about this approach.

––––––––––––

[10] Under my reading of §2254(d)(1), of course, the district court would review properly admitted new evidence through the deferential lens of §2254(d)(1), not *de novo*.

*Ante*, at 10. Under §2254(d)(1), federal courts routinely engage in analysis that the state court itself might never have conducted or did not conduct. For example, when a state court summarily denies a claim without explanation, as the California Supreme Court did here, district courts must deny habeas relief pursuant to §2254(d)(1) so long as "there is any reasonable argument" supporting the denial of the petitioner's claim. *Harrington*, 562 U. S., at ___ (slip op., at 16). We likewise ask whether a state-court decision unreasonably applied clearly established federal law when the state court issued a reasoned decision but failed to cite federal law altogether. See *Early* v. *Packer*, 537 U. S. 3, 8 (2002) *(per curiam)*. Determining whether a state court could reasonably have denied a petitioner relief in light of newly discovered evidence is not so different than determining whether there is any reasonable basis for a state court's unreasoned decision.

Admittedly, the text of §2254(d)(1), standing alone, does not compel either reading of that provision. But construing §2254(d)(1) to permit consideration of evidence properly introduced in federal court best accords with the text of §2254(d)(2) and AEDPA's structure as a whole. By interpreting §2254(d)(1) to prevent *nondiligent* petitioners from gaming the system—the very purpose of §2254(e)(2)—the majority potentially has put habeas relief out of reach for *diligent* petitioners with meritorious claims based on new evidence.

## C

The majority claims that its holding is "consistent" with our case law. *Ante*, at 10. Quite the opposite is true: Our cases reflect our previous understanding that evidence properly admitted pursuant to §2254(e)(2) is relevant to the §2254(d)(1) analysis.

In *Landrigan*, JUSTICE THOMAS, the author of today's opinion, confirmed this understanding of the interplay

between §§2254(d)(1) and 2254(e)(2). As noted above, we admonished district courts to consider whether a petitioner's allegations, if proved true, would satisfy §2254(d) in determining whether to grant a hearing. After highlighting the deference owed to state courts under §§2254(d) and 2254(e)(1), we stated:

> "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. Because the deferential standards prescribed by §2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." 550 U. S., at 474 (citation omitted).

By instructing district courts to consider the §2254(d) standards in deciding whether to grant a hearing, we must have understood that the evidence admitted at a hearing could be considered in the §2254(d)(1) analysis. See Brief for American Civil Liberties Union as *Amicus Curiae* 9 ("The whole point of *Landrigan*'s admonition that the court must decide whether to hold a hearing with an eye on §2254(d)(1) is that some proffers of evidence will not justify federal fact-finding in view of §2254(d)(1), but that other proffers of proof *will*").[11]

In *Michael Williams*, the warden argued that §2254(e)(2) bars an evidentiary hearing whenever a petitioner was unable to develop the factual record in state court, "whether or not through his own fault or neglect."

---

[11] The majority overlooks this aspect of *Landrigan*. It quotes *Landrigan*'s observation that "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing," 550 U. S., at 474, but that statement has no bearing on the question decided by the Court today.

529 U. S., at 430. Under the warden's argument, a petitioner who did not develop the record in state court, whatever the reason, would be barred from presenting evidence to the federal court. In rejecting that argument, we observed:

> "A prisoner who developed his claim in state court and can prove the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' is not barred from obtaining relief by §2254(d)(1). If the opening clause of §2254(e)(2) covers a request for an evidentiary hearing on a claim which was pursued with diligence but remained undeveloped in state court because, for instance, the prosecution concealed the facts, a prisoner lacking clear and convincing evidence of innocence could be barred from a hearing on the claim *even if he could satisfy §2254(d)*." *Id.*, at 434 (citation omitted; emphasis added).

A petitioner in the latter situation would almost certainly be unable to "satisfy §2254(d)" without introducing the concealed facts in federal court. This passage thus reflects our understanding that, in some circumstances, a petitioner might need an evidentiary hearing in federal court to prove the facts necessary to satisfy §2254(d). To avoid foreclosing habeas relief for such petitioners, we concluded that §2254(e)(2) could not bear the warden's "harsh reading," which essentially would have held petitioners strictly at fault for their inability to develop the facts in state court. *Ibid.* The majority today gives an equally "harsh reading" to §2254(d)(1) to achieve the result we rejected in *Michael Williams*.[12]

---

[12] The majority claims that *Michael Williams* supports its reading of §2254(d)(1). With respect to one claim asserted by the petitioner, we observed that "[t]he Court of Appeals rejected this claim on the merits

None of the other cases cited by the majority supports its result. In *Williams* v. *Taylor*, 529 U. S. 362 (2000) *(Terry Williams)*, we interpreted §2254(d)(1) to ask whether the state-court decision "identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*, at 413. However, we had no reason to decide whether the §2254(d)(1) inquiry was limited to the state-court record, as the District Court did not hold an evidentiary hearing in that case. See *id.*, at 372.

In *Holland* v. *Jackson*, we stated that "we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it." 542 U. S., at 652. In the next sentence, however, we observed that the evidence at issue "could have been the subject of an evidentiary hearing by the District Court, but only if respondent was not at fault in failing to develop that evidence in state court." *Id.*, at 652–653. We proceeded to find that the evidence was not properly admitted under §2254(e)(2) *before* concluding that the Court of Appeals had erred in its §2254(d)(1) analysis. *Id.*, at 653; see also *Bradshaw* v. *Richey*, 546 U. S. 74, 79 (2005) *(per curiam).*

In sum, our cases reflect our recognition that it is sometimes appropriate to consider new evidence in deciding whether a petitioner can satisfy §2254(d)(1). In reading our precedent to require the opposite conclusion, the majority disregards the concerns that motivated our decision in *Michael Williams:* Some petitioners, even if diligent,

_____

under §2254(d)(1), so it is unnecessary to reach the question whether §2254(e)(2) would permit a hearing on the claim." 529 U. S., at 444. That statement merely reflects the fact that the Court of Appeals had rejected that claim under §2254(d)(1) without considering whether the petitioner was entitled to a hearing because the petitioner had not requested a hearing on that claim. See *Williams* v. *Taylor*, 189 F. 3d 421, 425, 428–429 (CA4 1999).

may be unable to develop the factual record in state court through no fault of their own. We should not interpret §2254(d)(1) to foreclose these diligent petitioners from accessing the Great Writ when the state court will not consider the new evidence and could not reasonably have reached the same conclusion with the new evidence before it.

## II

I also disagree with the Court's conclusion that the Court of Appeals erred in holding that Pinholster had satisfied §2254(d)(1) on the basis of the state-court record.[13]

## A

The majority omits critical details relating to the performance of Pinholster's trial counsel, the mitigating evidence they failed to discover, and the history of these proceedings. I therefore highlight several aspects of the facts and history of this case.

---

[13] I agree with the majority that the state-court record in this case consists of "the 'allegations of [the] habeas corpus petition . . . and . . . any matter of record pertaining to the case.'" *Ante*, at 16, n. 12 (quoting *In re Hochberg*, 2 Cal. 3d 870, 874, n. 2, 471 P. 2d 1, 3–4, n. 2 (1970); some internal quotation marks omitted).

The majority does not decide which of the two state-court decisions should be reviewed. See *ante*, at 15, n. 11. One *amicus* argues that Pinholster must prove that *both* state-court decisions involved an unreasonable application of law. See Brief for Criminal Justice Legal Foundation as *Amicus Curiae* 26. This argument is based on *amicus'* understanding that the California Supreme Court rejected the second petition as successive and, alternatively, on the merits. The State has not argued, however, that the second ruling rests on a procedural ground. See *ante*, at 6, n. 2. When a state court denies two petitions on the merits and the difference between the petitions is that the second petition contains additional evidence supporting the petitioner's claim, I see no reason why the petitioner must independently show that the first decision was unreasonable.

1

After the jury returned a guilty verdict, the court instructed the jury to return six days later for the penalty phase. This prompted discussion at sidebar regarding whether the State had provided notice of its intent to offer aggravating evidence. Pinholster's court-appointed attorney, Wilbur Dettmar, argued that the State should be precluded from offering aggravating evidence:

> "I am not presently prepared to offer anything by way of mitigation. If I was going to proceed on mitigation, the people would have the right to rebuttal with or without notice.
>
>  "I took the position, since the people had not given notice, *I had not prepared any evidence by way of mitigation.* I would submit it on that basis." 52 Reporter's Tr. 7250 (hereinafter Tr.) (emphasis added).

Undoubtedly anticipating that counsel might need additional time to prepare an adequate mitigation defense, the court asked Dettmar whether a continuance would be helpful in the event it ruled against him. He declined the offer on the spot, stating: "I think we would probably still go forward on Monday. Clearly the one person that comes to mind is the defendant's mother. How much beyond that I don't know. I don't think the pa[ss]age of time would make a great deal of difference." *Id.*, at 7257–7258. After hearing testimony, the court denied Pinholster's motion to preclude aggravating evidence.

At the penalty phase, defense counsel called only one witness: Pinholster's mother, Burnice Brashear. Brashear testified that Pinholster "never really wanted for anything at home too much" and "had everything normally materialwise that most people have." *Id.*, at 7395. She said that Pinholster was "different" from his siblings, whom she characterized as "basically very good children." *Id.*, at 7401–7402. Pinholster, she said, had a "friendly" relation-

ship with his stepfather, although his stepfather "some-
times would lose his temper" with Pinholster, who "had a
mind of his own." *Id.*, at 7392–7393; see also *id.*, at 7293
(stating that his stepfather was "at times" "abusive or
near abusive").

Brashear provided brief testimony regarding Pinhol-
ster's childhood. She described two car accidents—one
when she ran over him in the driveway and one when he
went through the windshield. *Id.*, at 7389–7391. She
stated that he started failing school in the first grade and
that the school eventually "sent him to [an] educationally
handicapped class." *Id.*, at 7393–7394. When Pinholster
was 10, a psychologist recommended placing him in a
mental institution, but she "didn't think he was that far
gone." *Id.*, at 7395. A few years later, she testified, he
spent six months in a state hospital for emotionally handi-
capped children. *Id.*, at 7402.

According to Brashear, Pinholster had suffered from
epilepsy since age 18, when he was beaten in jail. *Id.*,
at 7397. She said that her family doctor, Dr. Dubin,
had given him medication to treat the epilepsy. *Ibid.*
Brashear also suggested that Pinholster did not have long
to live, stating that he had "a chip in his head floating
around" and that "they don't think—he won't be here very
much longer anyway."[14] *Ibid.*

In closing argument, the prosecutor ridiculed Brashear's
testimony. See 53 *id.*, at 7442 ("She said his stepfather
disciplined him. So what? I am sure you have all disci-
plined your children. I was disciplined myself"); *ibid.* ("He
was run over by a car when he was three years old. That's
very unfortunate. There is no evidence of any brain dam-
age. A lot of children get dropped, fall from their cribs or

——————

[14] The judge instructed the jury to disregard this testimony upon
motion by the prosecutor, but the prosecutor then discussed the testi-
mony in her closing argument. See *infra*, at 33–34.

whatever"); *id.*, at 7444–7445 ("I submit to you that if this defendant truly had epilepsy, . . . a doctor would have been brought in to tell you that. Medical records, something"). The prosecutor also highlighted Brashear's testimony about Pinholster's stable home environment, arguing, "He came from a good home. You heard that he was not a deprived child. Had many things going for him, probably more than many children." *Id.*, at 7442.

Notwithstanding the meager mitigation case presented by Pinholster's counsel, it took the jury two days to reach a decision to sentence Pinholster to death. His counsel later moved to modify the sentence to life imprisonment. In denying the motion, the trial judge stated, "The evidence which the defense offered concerning the defendant's extenuation was merely some testimony from his mother that was not persuasive. His mother did not, in the court's opinion, present any evidence which the court would find to be a moral justification or extenuation for his conduct. No witness supplied such evidence." 54 *id.*, at 7514.

2

After his conviction and sentence were affirmed on appeal, Pinholster filed a habeas petition in the California Supreme Court alleging, among other things, that his counsel had "unreasonably failed to investigate, prepare and present available mitigating evidence during penalty phase." Record ER–103.

Pinholster's state-court petition included 121 exhibits. In a series of declarations, his trial attorney Harry Brainard (who had by then been disbarred) confirmed what Dettmar had forthrightly told the trial court: Brainard and Dettmar neither expected nor prepared to present mitigation evidence.[15] See *id.*, at ER–333 ("Mr.

---

[15] By the time of Pinholster's state-court habeas petition, Dettmar was deceased.

Dettmar and I did not prepare a case in mitigation. We felt there would be no penalty phase hearing inasmuch as we did not receive written notice of evidence in aggravation pursuant to Penal Code §190.3"). Brainard further confirmed what was apparent from the mitigation case they eventually put on: They conducted virtually no mitigation investigation. See *id.*, at ER–182 ("I have no recollection of Mr. Dettmar having secured or reviewed any of Scott's medical records, nor did I see any of Scott's medical records. So far as I recollect, neither Mr. Dettmar nor myself interviewed any of Scott's previous medical providers"); *id.*, at ER–183 ("I do not recall interviewing or attempting to interview Scott's family members or any other persons regarding penalty phase testimony, except Mrs. Brashears *[sic]*"); *ibid.* ("I have no recollection of seeing or attempting to secure Scott's school records, juvenile records, medical records, or records of prior placements"); *ibid.* ("I have no recollection of interviewing or attempting to interview Scott's former school teachers, counselors, or juvenile officers").[16]

Statements by relatives (none of whom trial counsel had attempted to interview regarding Pinholster's background) and documentary evidence revealed that the picture of Pinholster's family life painted by his mother at trial was false. Pinholster was "raised in chaos and poverty." *Id.*, at ER–312. A relative remembered seeing the children mix together flour and water in an attempt to get something to eat. Pinholster's stepfather beat him several times a week, including at least once with a two-by-four board. "There was so much violence in [the] home" that Pinholster's brother "dreaded coming home each day." *Id.*, at ER–313. Pinholster's half sister was removed from the home as a result of a beating by his stepfather.

---

[16] Counsel's billing records, which were before the California Supreme Court as part of the trial record, confirmed Brainard's recollection.

Documentary evidence showed, directly contrary to Brashear's trial testimony, that Pinholster's siblings had very troubled pasts. Pinholster's elder brother was arrested for armed burglary, robbery, and forcible rape of a 14-year-old with a deadly weapon. While in custody, he was diagnosed as "catatonic-like" and "acutely psychotic, probably suffering some type of schizophrenia." *Id.*, at ER–219, ER–224. He later committed suicide.[17] Pinholster's half sister, a recovering alcoholic, had been made a ward of the juvenile court for prostitution and forcible sexual battery on a 14-year-old.

Pinholster's petition and exhibits described a long history of emotional disturbance and neurological problems. A former schoolteacher stated that, as a child, Pinholster "seemed incapable of relating either to his peers or to adults," that "[i]t was even hard to maintain eye contact with him," and that "[h]is hyperactivity was so extreme that [she] formed the opinion it probably had an organic base." *Id.*, at ER–231. School records revealed that he "talk[ed] to self continuously," had "many grimaces," fought in his sleep, and could "control self for only 1 hour per day." *Id.*, at ER–230, ER–233. He "show[ed] progressive deterioration each semester since Kindergarten." *Id.*, at ER–230. School officials recommended placement in a school for emotionally handicapped students and referral to a neurologist. At age nine, he had an abnormal EEG, revealing "an organic basis for his behavior." *Id.*, at ER–157, ER–234. Just months before the homicides, a doctor recommended placement in the Hope Psychiatric Institute, but this did not occur.

This and other evidence attached to the petition was

——————

[17] According to Pinholster's half sister, "The death of our brother Alvin was a severe emotional blow to me and to Scott. I believed Scott's substance abuse (heroin) arose following and as a result of Alvin's death." Record ER–314.

summarized in a declaration by Dr. George Woods. Dr. Woods opined that Pinholster "suffer[ed] from severe and long standing seizure disorders," *id.*, at ER–156, that his childhood head traumas "may have been the precipitating factors for [his] seizure disorder," *id.*, at ER–157, and that he suffered from bipolar mood disorder. He pointed to trial testimony that immediately before the burglary on the night of the homicides, Pinholster announced that he "'ha[d] a message from God'"—which Dr. Woods believed to reflect "[a]uditory hallucinations" and "severe psychosis." *Id.*, at ER–169. He concluded that at the time of the homicides Pinholster "was suffering from bipolar mood disorder with psychotic ideation and was suffering a complex partial seizure." *Id.*, at ER–170. He also observed that Pinholster's "grossly dysfunctional family, the abuse he received as a child, his history of suffering from substantial seizure and mood disorders, his frequently untreated psychiatric and psychological disabilities and his educational handicaps were relevant circumstances which would extenuate the gravity of the crime." *Id.*, at ER–171.

On the basis of Pinholster's submission, the California Supreme Court denied Pinholster's ineffective-assistance-of-counsel claim.

Pinholster then filed a habeas petition in Federal District Court. He included an additional exhibit: a declaration by Dr. John Stalberg, a psychiatrist who had hastily examined Pinholster and produced a two-page report in the middle of the original trial.[18] After reviewing the new material collected by Pinholster's habeas counsel, Dr. Stalberg stated that the available evidence showed a

———————

[18] Counsel had arranged for Dr. Stalberg to examine Pinholster in the middle of his original trial. The only documents they provided to him were police reports relating to the case and a 1978 probation report. In a two-page report that focused primarily on Pinholster's mental state at the time of the offenses, Dr. Stalberg concluded that Pinholster had "psychopathic personality traits." *Id.*, at ER–187.

familial history of "severe psychiatric disorders," "a history of seizure disorders of unknown etiology," "repeated head traumas," "an abnormal EEG," and "evidence of mental disturbance during Mr. Pinholster's childhood and some degree of brain damage." *Id.*, at ER–493. He also opined that "there [was] voluminous mitigating evidence which includes a childhood of physical abuse, emotional neglect, and a family history of mental illness and criminal behavior." *Id.*, at ER–494.

The District Court stayed the federal proceedings while Pinholster sought state-court review of claims the District Court deemed unexhausted. Pinholster's second habeas submission to the California Supreme Court included Stalberg's declaration. That court summarily denied Pinholster's petition on the merits.

Pinholster returned to Federal District Court and filed an amended petition. After an evidentiary hearing, the District Court concluded that Pinholster had demonstrated deficient performance and prejudice under *Strickland*.[19] The Ninth Circuit, sitting en banc, affirmed. 590 F. 3d 651.

B

As the majority notes, Pinholster's claim arises under *Strickland* v. *Washington*. "The benchmark for judging any claim of ineffectiveness [under *Strickland*] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U. S.,

---

[19] The District Court based its decision on the evidence adduced at an evidentiary hearing. The District Court did not apply 28 U. S. C. §2254(d) because it thought, erroneously, that the California Supreme Court had not adjudicated Pinholster's claim on the merits. App. to Pet. for Cert. 257. For the reasons I discuss, however, the District Court could have concluded that Pinholster had satisfied §2254(d)(1) on the basis of the state-court record alone.

at 686. To satisfy this benchmark, a defendant must show both that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Id.*, at 687.

When §2254(d)(1) applies, the question is whether "'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U. S., at \_\_\_ (slip op., at 11) (quoting *Yarborough* v. *Alvarado*, 541 U. S. 652, 664 (2004)). When the state court rejected a *Strickland* claim on the pleadings assuming the allegations to be true, as here, see *ante*, at 16, n. 12, the federal court must ask whether "there is any reasonable argument" supporting the state court's conclusion that the petitioner's allegations did not state a claim, *Harrington*, 562 U. S., at \_\_\_ (slip op., at 16). This standard is "difficult," but not impossible, "to meet." *Id.*, at \_\_\_ (slip op., at 12). This case is one in which fairminded jurists could not disagree that the state court erred.

## C

Under *Strickland*, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," measured according to "prevailing professional norms." 466 U. S., at 688. We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*, at 689. When §2254(d) applies, federal-court review is "'doubly'" deferential. *Harrington*, 562 U. S., at \_\_\_ (slip op., at 16) (quoting *Knowles* v. *Mirzayance*, 556 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 11)). In the present AEDPA posture, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U. S., at \_\_\_ (slip op., at 16). Here, there is none.

The majority surmises that counsel decided on a strategy "to get the prosecution's aggravation witnesses ex-

cluded for lack of notice, and if that failed, to put on Pinholster's mother." *Ante*, at 19. This is the sort of "'*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions" that courts cannot indulge. *Harrington*, 562 U. S., at ___ (slip op., at 20) (quoting *Wiggins* v. *Smith*, 539 U. S. 510, 526–527 (2003)). The majority's explanation for counsel's conduct contradicts the best available evidence of counsel's actions: Dettmar's frank, contemporaneous statement to the trial judge that he "had not prepared any evidence by way of mitigation." 52 Tr. 7250. The majority's conjecture that counsel had in fact prepared a mitigation defense, based primarily on isolated entries in counsel's billing records, requires it to assume that Dettmar was lying to the trial judge.[20]

In any event, even if Pinholster's counsel had a strategic reason for their actions, that would not automatically render their actions reasonable. For example, had counsel decided their best option was to move to exclude the aggravating evidence, it would have been unreasonable to forgo a mitigation investigation on the hope that the motion would be granted. With a client's life at stake, it would "flou[t] prudence," *Rompilla* v. *Beard*, 545 U. S. 374,

---

[20] The majority misleadingly cites entries showing that counsel were preparing Brashear's penalty phase testimony *after* counsel learned that the State intended to present aggravation evidence. The cited entries predating that event show only that counsel conducted about one day's worth of investigation—consisting of talking to Brashear and researching epilepsy—two months before the penalty phase. See 3 Clerk's Tr. 798 (1.5-hour phone call to Brashear on Jan. 13); *id.*, at 864, 869 (3-hour meeting with Brashear regarding "childhood problems" on Feb. 23); *id.*, at 869 (3.5 hours for "[r]esearch re; epilepsy and conf. with nurse" on Feb. 25). There is no evidence in the records that counsel actually planned to present mitigating evidence. Indeed, their complete failure to follow up on any of the information they learned in their minimal investigation only confirms that they were not planning to present mitigating evidence. See *infra*, at 29–31.

389 (2005), for an attorney to rely on the possibility that the court might preclude aggravating evidence pursuant to a "legal technicality" without any backup plan in place in case the court denied the motion, *ante*, at 19. No reasonable attorney would pursue such a risky strategy. I do not understand the majority to suggest otherwise.

Instead, I understand the majority's conclusion that counsel's actions were reasonable to rest on its belief that they did have a backup plan: a family-sympathy defense. In reaching this conclusion, the majority commits the same *Strickland* error that we corrected, applying §2254(d)(1), in *Wiggins:* It holds a purportedly "tactical judgment" to be reasonable without assessing "the adequacy of the investigatio[n] supporting [that] judgmen[t]," 539 U. S., at 521. As we stated in *Strickland:*

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U. S., at 690–691.

We have repeatedly applied this principle since *Strickland.* See *Sears* v. *Upton*, 561 U. S. ___, ___ (2010) *(per curiam)* (slip op., at 9); *Porter* v. *McCollum*, 558 U. S. ___, ___ (2009) *(per curiam)* (slip op., at 10); *Wiggins*, 539 U. S.,

at 527; *Terry Williams*, 529 U. S., at 396.[21]

As these cases make clear, the prevailing professional norms at the time of Pinholster's trial required his attorneys to "conduct a thorough investigation of the defendant's background," *ibid.* (citing 1 ABA Standards for Criminal Justice 4–4.1, commentary, p. 4–55 (2d ed. 1980) (hereinafter ABA Standards)), or "to make a reasonable decision that makes particular investigations unnecessary," *Strickland*, 466 U. S., at 691.[22] "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla*, 545 U. S., at 381 (quoting *Strickland*, 466 U. S., at 689, 691; citation omitted). In some cases, "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U. S., at 383; see, *e.g.*, *Bobby* v. *Van Hook*, 558 U. S. ___, ___ (2009) *(per curiam)* (slip op., at 8); *Burger* v. *Kemp*, 483 U. S. 776, 794–795 (1987). In other cases, however, *Strickland* requires further investigation.

---

[21] I do not doubt that a decision to present a family-sympathy mitigation defense might be consistent "with the standard of professional competence in capital cases that prevailed in Los Angeles in 1984" in some cases. *Ante*, at 24. My point is that even if counsel made a strategic decision to proceed with such a defense, that decision was unreasonable because it was based on an unreasonably incomplete investigation.

[22] See also 1 ABA Standards 4–4.1, commentary, at 4–55 ("Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself"). As we recognized in *Strickland*, the ABA Standards, though not dispositive, "are guides to determining what is reasonable." 466 U. S., at 688; see also *Wiggins* v. *Smith*, 539 U. S. 510, 524 (2003).

*Wiggins* is illustrative of the competence we have required of counsel in a capital case. There, counsel's investigation was limited to three sources: psychological testing, a presentencing report, and Department of Social Services records. 539 U. S., at 523–524. The records revealed that the petitioner's mother was an alcoholic, that he displayed emotional difficulties in foster care, that he was frequently absent from school, and that on one occasion, his mother left him alone for days without food. *Id.*, at 525. In these circumstances, we concluded, "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Ibid.* Accordingly, we held, the state court's assumption that counsel's investigation was adequate was an unreasonable application of *Strickland.* 539 U. S., at 528.[23]

This case is remarkably similar to *Wiggins.* As the majority reads the record, counsel's mitigation investigation consisted of talking to Pinholster's mother, consulting with Dr. Stalberg, and researching epilepsy.[24] *Ante*, at 20. What little information counsel gleaned from this "rudimentary" investigation, *Wiggins*, 539 U. S., at 524, would have led any reasonable attorney "to investigate further," *id.*, at 527. Counsel learned from Pinholster's mother that he attended a class for educationally handicapped children, that a psychologist had recommended placing him in a mental institution, and that he spent time in a state

--------

[23] As the majority notes, see *ante*, at 24–25, Wiggins' trial counsel acknowledged that the investigation he conducted was inconsistent with standard practice in Maryland. See 539 U. S., at 524. We independently concluded, however, that the investigation "was *also* unreasonable in light of what counsel actually discovered in the . . . records." *Id.*, at 525 (emphasis added).

[24] The majority also posits that Brainard likely spent time preparing Pinholster's brother Terry. However, Terry averred in a declaration that Pinholster's attorneys "never asked [him] any questions relating to Scott's background or [their] family history." Record ER–313.

hospital for emotionally handicapped children. They knew that Pinholster had been diagnosed with epilepsy.

"[A]ny reasonably competent attorney would have realized that pursuing" the leads suggested by this information "was necessary to making an informed choice among possible defenses." *Id.*, at 525; see also *Penry* v. *Lynaugh*, 492 U. S. 302, 319 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse" (internal quotation marks omitted)). Yet counsel made no effort to obtain the readily available evidence suggested by the information they learned, such as Pinholster's schooling or medical records, or to contact Pinholster's school authorities. They did not contact Dr. Dubin or the many other health-care providers who had treated Pinholster. Put simply, counsel "failed to act while potentially powerful mitigating evidence stared them in the face." *Bobby*, 558 U. S., at ___ (slip op., at 8) (citing *Wiggins*, 539 U. S., at 525).

The "impediments" facing counsel, *ante*, at 21, did not justify their minimal investigation. It is true that Pinholster was "an unsympathetic client." *Ibid.* But this fact compounds, rather than excuses, counsel's deficiency in ignoring the glaring avenues of investigation that could explain why Pinholster was the way he was. See *Sears*, 561 U. S., at ___ (slip op., at 7) ("This evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears, and his horrendous acts—especially in light of his purportedly stable upbringing"). Nor can Dr. Stalberg's two-page report, which was based on a very limited record and focused primarily on Pinholster's mental state at the time of the homicides, excuse counsel's failure to investigate the

broader range of potential mitigating circumstances.

"The record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U. S., at 526. Dettmar told the trial judge that he was unprepared to present any mitigation evidence. The mitigation case that counsel eventually put on can be described, at best, as "halfhearted." *Ibid.* Counsel made no effort to bolster Brashear's self-interested testimony with school or medical records, as the prosecutor effectively emphasized in closing argument. And because they did not pursue obvious leads, they failed to recognize that Brashear's testimony painting Pinholster as the bad apple in a normal, nondeprived family was false.

In denying Pinholster's claim, the California Supreme Court necessarily overlooked *Strickland*'s clearly established admonition that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations." 466 U. S., at 690–691. As in *Wiggins*, in light of the information available to Pinholster's counsel, it is plain that "reasonable professional judgments" could not have supported their woefully inadequate investigation.[25] 466 U. S., at 691. Accordingly, the California Supreme Court could not reasonably have concluded that Pinholster

---

[25] The majority chastises the Court of Appeals for "attributing strict rules to this Court's recent case law." *Ante*, at 24. I agree that courts should not interpret our cases to prescribe strict rules regarding the required scope of mitigation investigations. See *Rompilla* v. *Beard*, 545 U. S. 374, 394 (2005) (O'Connor, J., concurring) (noting "our longstanding case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*"). The Ninth Circuit, however, did no such thing. It appropriately gave thoughtful consideration to the guideposts contained in these cases, just as we have previously done. See, *e.g.*, *Bobby* v. *Van Hook*, 558 U. S. \_\_\_, \_\_\_ (2009) *(per curiam)* (slip op., at 8).

had failed to allege that his counsel's investigation was inadequate under *Strickland.*

### D

The majority also concludes that the California Supreme Court could reasonably have concluded that Pinholster did not state a claim of prejudice. This conclusion, in light of the overwhelming mitigating evidence that was not before the jury, is wrong. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694. When a habeas petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.*, at 695. This inquiry requires evaluating "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." *Terry Williams*, 529 U. S., at 397–398. The ultimate question in this case is whether, taking into account all the mitigating and aggravating evidence, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U. S., at 537; see Cal. Penal Code Ann. §190.4(b) (West 2008) (requiring a unanimous jury verdict to impose a death sentence).

### 1

Like the majority, I first consider the aggravating and mitigating evidence presented at trial. By virtue of its verdict in the guilt phase, the jury had already concluded that Pinholster had stabbed and killed the victims. As the majority states, the jury saw Pinholster "revel" in his history of burglaries during the guilt phase. *Ante*, at 26.

The jury heard evidence of Pinholster's violent tendencies: He had kidnapped someone with a knife, cut a person in the arm with a razor, and had a history of hitting and kicking people. He threatened to kill the State's lead witness. And he had an extensive disciplinary record in jail.

Brashear offered brief testimony that was apparently intended to be mitigating. See *supra*, at 19–20; see also *ante*, at 27–28.[26] However, as the prosecutor argued, Brashear was not a neutral witness. See 53 Tr. 7441 ("A mother clearly loves her son, ladies and gentlemen. Clearly not the most unbiased witness in the world"). Notwithstanding Brashear's obvious self-interest, counsel failed to offer readily available, objective evidence that would have substantiated and expanded on her testimony. Their failure to do so allowed the prosecutor to belittle her testimony in closing argument. See *supra*, at 19–20. And Brashear's statement that Pinholster would not be alive much longer because he had "a chip in his head floating around," 52 Tr. 7397, could only have undermined her credibility, as the prosecutor urged, see 53 *id.*, at 7447 ("Does she want you to believe sometime before he got to

_____

[26] The majority mischaracterizes several aspects of Brashear's testimony. Although Brashear testified that the family "didn't have lots of money," she followed up that comment by stating that Pinholster did not bring friends to the house because "it was too nice a house." 52 Tr. 7404. The prosecutor did not understand Brashear to have testified that Pinholster's childhood was deprived. See 53 *id.*, at 7442 ("You heard that he was not a deprived child"). Nor did the California Supreme Court on direct appeal. *People* v. *Pinholster*, 1 Cal. 4th 865, 910, 824 P. 2d 571, 587 (1992).

Brashear did testify that Pinholster's stepfather tried to "discipline" him and that he was "at times" "abusive or near abusive." 52 Tr. 7392–7393. She suggested, however, that Pinholster deserved the "discipline" he received. See, *e.g.*, *id.*, at 7392 ("Scott was always—he had a mind of his own"). It is unlikely the jury understood Brashear to be suggesting that her husband routinely beat Pinholster. The prosecutor did not come away with this understanding. See 53 *id.*, at 7442.

country jail some doctor looked in a crystal ball and said, 'In three years you are going to die'?  That's ridiculous").  The trial judge was thoroughly unimpressed with Brashear's testimony.  See *supra*, at 20.

Moreover, the evidence presented in Pinholster's state-court petition revealed that Brashear distorted facts in her testimony in ways that undermined Pinholster's mitigation case.  As in *Sears*, 561 U. S., at ___ (slip op., at 3), the prosecutor used Brashear's testimony that Pinholster came from a good family against him.  See 53 Tr. 7442.

In sum, counsel presented little in the way of mitigating evidence, and the prosecutor effectively used their half-hearted attempt to present a mitigation case to advocate for the death penalty.  The jury nonetheless took two days to reach a decision to impose a death sentence.

2

The additional mitigating evidence presented to the California Supreme Court "adds up to a mitigation case that bears no relation" to Brashear's unsubstantiated testimony.  *Rompilla*, 545 U. S., at 393.

Assuming the evidence presented to the California Supreme Court to be true, as that court was required to do, the new mitigating evidence presented to that court would have shown that Pinholster was raised in "chaos and poverty."  Record ER–312.  The family home was filled with violence.  Pinholster's siblings had extremely troubled pasts.  There was substantial evidence of "mental disturbance during Mr. Pinholster's childhood and some degree of brain damage."  *Id.*, at ER–493.

Dr. Woods concluded that Pinholster's aggressive conduct resulted from bipolar mood disorder.  Just months before the murders, a doctor had recommended that Pinholster be sent to a psychiatric institute.  Dr. Woods also explained that Pinholster's bizarre behavior before the murders reflected "[a]uditory hallucinations" and "severe

psychosis." *Id.*, at ER–169. The available records confirmed that Pinholster suffered from longstanding seizure disorders, which may have been caused by his childhood head injuries.

On this record, I do not see how it can be said that "[t]he 'new' evidence largely duplicated the mitigation evidence at trial." *Ante*, at 29; see *Arizona* v. *Fulminante*, 499 U. S. 279, 298–299 (1991) (evidence is not "merely cumulative" if it corroborates other evidence that is "unbelievable" on its own). Brashear's self-interested testimony was not confirmed with objective evidence, as the prosecutor highlighted. The new evidence would have "destroyed the [relatively] benign conception of [Pinholster's] upbringing" presented by his mother. *Rompilla*, 545 U. S., at 391. The jury heard no testimony at all that Pinholster likely suffered from brain damage or bipolar mood disorder, and counsel offered no evidence to help the jury understand the likely effect of Pinholster's head injuries or his bizarre behavior on the night of the homicides. The jury heard no testimony recounting the substantial evidence of Pinholster's likely neurological problems. And it heard no medical evidence that Pinholster suffered from epilepsy.

The majority responds that "much" of Pinholster's new mitigating evidence "is of questionable mitigating value." *Ante*, at 29. By presenting psychiatric testimony, it contends, "Pinholster would have opened the door to rebuttal by a state expert." *Ibid.* But, because the California Supreme Court denied Pinholster's petition on the pleadings, it had no reason to know what a state expert might have said. Moreover, given the record evidence, it is reasonably probable that at least one juror would have credited his expert. In any event, even if a rebuttal expert testified that Pinholster suffered from antisocial personality disorder, this would hardly have come as a surprise to the jury. See *ante*, at 22 (describing Pinholster as a "psychotic client whose performance at trial hardly endeared

him to the jury"). It is for this reason that it was espe-
cially important for counsel to present the available evi-
dence to help the jury understand Pinholster. See *Sears*,
561 U. S., at ___ (slip op., at 6–7).

  Had counsel conducted an adequate investigation, the
judge and jury would have heard credible evidence show-
ing that Pinholster's criminal acts and aggressive tenden-
cies were "attributable to a disadvantaged background, or
to emotional and mental problems." *Penry*, 492 U. S., at
319 (internal quotation marks omitted). They would have
learned that Pinholster had the "'kind of troubled history
we have declared relevant to assessing a defendant's
moral culpability.'" *Porter*, 558 U. S., at ___ (slip op., at 12)
(quoting *Wiggins*, 539 U. S., at 535). Applying *Strickland*,
we have repeatedly found "a reasonable probability," 466
U. S., at 694, that the sentencer would have reached a
different result had counsel presented similar evidence.
See, *e.g.*, *Porter*, 558 U. S., at ___ (slip op., at 12–13) (evi-
dence of the defendant's childhood history of physical
abuse, brain abnormality, limited schooling, and heroic
military service); *Rompilla*, 545 U. S., at 392 (evidence of
severe abuse and neglect as a child, as well as brain
damage); *Wiggins*, 539 U. S., at 535 (evidence of the de-
fendant's "severe privation and abuse" as a child, home-
lessness, and "diminished mental capacities"); *Terry
Williams*, 529 U. S., at 398 (evidence of childhood
mistreatment and neglect, head injuries, possible organic
mental impairments, and borderline mental retardation).

  The majority does not dispute the similarity between
this case and the cited cases. However, it criticizes the
Court of Appeals for relying on *Rompilla* and *Terry Wil-
liams* on the ground that we reviewed the prejudice ques-
tion *de novo* in those cases. See *ante*, at 31. I do not read
*Terry Williams* to review the prejudice question *de novo*.[27]

---

  [27] *Terry Williams* held that the state court's decision was "unreason-

More fundamentally, however, I cannot agree with the premise that "[t]hose cases . . . offer no guidance with respect to whether a state court has unreasonably determined that prejudice is lacking." *Ante*, at 31 (emphasis deleted). In each of these cases, we did not purport to create new law; we simply applied the same clearly established precedent, *Strickland*, to a different set of facts. Because these cases illuminate the kinds of mitigation evidence that suffice to establish prejudice under *Strickland*, they provide useful, but not dispositive, guidance for courts to consider when determining whether a state court has unreasonably applied *Strickland*.

In many cases, a state court presented with additional mitigation evidence will reasonably conclude that there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S., at 694. This is not such a case. Admittedly, Pinholster unjustifiably stabbed and killed two people, and his history of violent outbursts and burglaries surely did not endear him to the jury. But the homicides did not appear premeditated. And the State's aggravation case was no stronger than in *Rompilla* and *Terry Williams*. See 545 U. S., at 378, 383 (the defendant committed murder by torture and had a significant history of violent felonies, including a rape); 529 U. S., at 418 (Rehnquist, C. J., concurring in part and dissenting in part) (the defendant had a lifetime of crime, and after the murder he "savagely beat an elderly woman," set a home on fire, and stabbed a man (internal quotation marks omitted)). Even on the trial record, it took the jury two days to decide on a penalty. The contrast between the "not

able in at least two respects": (1) It applied the wrong legal standard, see 529 U. S., at 397, and (2) it "failed to accord appropriate weight to the body of mitigation evidence available to trial counsel," *id.*, at 398. We did not purport to conduct *de novo* review.

persuasive" mitigation case put on by Pinholster's counsel, 54 Tr. 7514, and the substantial mitigation evidence at their fingertips was stark. Given these considerations, it is not a foregone conclusion, as the majority deems it, that a juror familiar with his troubled background and psychiatric issues would have reached the same conclusion regarding Pinholster's culpability. Fairminded jurists could not doubt that, on the record before the California Supreme Court, "there [was] a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U. S., at 537.

## III

The state-court record on its own was more than adequate to support the Court of Appeals' conclusion that the California Supreme Court could not reasonably have rejected Pinholster's *Strickland* claim. The additional evidence presented in the federal evidentiary hearing only confirms that conclusion.

## A

At the hearing, Pinholster offered many of the same documents that were before the state habeas court. He also offered his trial attorneys' billing records, which were before the state habeas court as part of the trial record. Of the seven lay witnesses who testified at the hearing, six had previously executed declarations in support of Pinholster's state-court petition. (The seventh, Pinholster's uncle, provided testimony cumulative of other testimony.)

Two experts testified on Pinholster's behalf; neither had presented declarations to the state habeas court. The first was Dr. Donald Olson, assistant professor of neurology and neurological sciences and director of the Pediatric Epilepsy Program at Stanford University Medical Center. It appears that Pinholster retained Dr. Olson to rebut the testimony of the expert disclosed by the State in the fed-

eral proceeding. See Decl. of Michael D. Abzug in Support of Stipulated *Ex Parte* Application to Continue Evidentiary Hearing and Discovery Cut-Off and to Substitute Counsel in *Pinholster* v. *Calderon*, No. CV 95–6240–GLT (CD Cal.), p. 2. Relying in part on Pinholster's abnormal EEG, Dr. Olson opined that Pinholster's childhood accidents "likely result[ed] in brain injury" and that these injuries "conferred a risk of epilepsy." Record ER–699 to ER–700. He concluded that it was reasonably probable that Pinholster had suffered from partial epilepsy since at least 1968 and had suffered from brain injury since at least 1964. *Id.*, at ER–701.

Pinholster's second expert was Dr. Sophia Vinogradov, associate professor of psychiatry at the University of California, San Francisco. Dr. Vinogradov's testimony was based on essentially the same facts as Dr. Woods' and Dr. Stalberg's state-court declarations. She highlighted Pinholster's childhood head traumas, history of epilepsy, abusive and neglected upbringing, history of substance abuse, and bizarre behavior on the night of the homicides. She opined that his aggressive behavior resulted from childhood head traumas:

> "All data indicates that there were severe effects of the two serious head injuries sustained at age 2 and age 3, with evidence for behavioral changes related to dysfunction of frontal cortex: severe attentional and learning problems in childhood, hyperactivity, aggressivity, impulsivity, social-emotional impairment, seizure disorder, and explosive dyscontrol." *Id.*, at ER–731.

She also opined that, right before the homicides, Pinholster was in an "apparently hallucinatory state [that] was likely the result of his intoxication with multiple substances." *Id.*, at ER–707

The State presented two experts: Dr. Stalberg, the

psychiatrist who had examined Pinholster in the middle of trial,[28] and Dr. David Rudnick. Although Dr. Stalberg maintained that Pinholster suffered from antisocial personality disorder, which was his original diagnosis in the middle of trial, he again emphasized that there was "voluminous" and "compelling" mitigation evidence that had not previously been made available to him or presented to the jury. *Id.*, at ER–926, ER–953. He stated that conversations with Pinholster's family revealed that he and his siblings were "raised like animals, wild animals," *id.*, at ER–948, and he opined that Pinholster's upbringing was a risk factor for antisocial personality disorder. See *ibid.* (Pinholster's upbringing "would speak volumes, looking at it from a mitigation point of view"). And he agreed that the mitigation evidence presented at trial was "profoundly misleading." *Id.*, at ER–966. Dr. Rudnick testified that Pinholster suffered from antisocial personality disorder.

The State also introduced into evidence the 1978 probation report that Pinholster's counsel had in their possession at the time of his trial. The report demonstrated that counsel were aware that Pinholster was in classes for educationally handicapped children, that he was committed to a state hospital for emotionally handicapped children, and that he suffered two "severe head injuries." *Id.*, at SER–243.

## B

Much of the evidence presented at the federal hearing

---

[28] Before the hearing, Dr. Stalberg had opined that Pinholster was "substantially impaired by a bipolar mood disorder operating synergistically with intoxication and a seizure disorder at the time the crime was committed." Record ER–587. At a prehearing deposition, however, Dr. Stalberg revised his opinion and stated that he continued to believe that Pinholster suffered from psychopathic personality traits. After the deposition, Pinholster elected to proceed with a different expert, presumably in light of Dr. Stalberg's unexpected change in position. The State then retained Dr. Stalberg as its own expert.

was duplicative of the evidence submitted to the California Supreme Court. The additional evidence presented at the hearing only confirmed that the California Supreme Court could not reasonably have rejected Pinholster's claim.[29]

For example, the probation report presented by the State confirmed that counsel had in their possession information that would have led any reasonable attorney "to investigate further." *Wiggins*, 539 U. S., at 527. Counsel nevertheless took no action to investigate these leads.

Pinholster's experts opined that his childhood head traumas likely resulted in brain injury and conferred a risk of epilepsy. Although the State presented testimony that Pinholster had antisocial personality disorder, it was not clear error for the District Court to conclude that jurors could have credited Pinholster's experts. Even the

---

[29] The State argues that the District Court was not entitled to rely on the evidence adduced at the hearing because Pinholster was not diligent in developing his claims in state court and the hearing was therefore barred by 28 U. S. C. §2254(e)(2). This argument is somewhat imprecise. Pinholster's allegations in his amended federal petition were "identical" to the allegations he presented to the California Supreme Court, *ante*, at 6, and he diligently requested a hearing in state court. The State presumably means to argue that Pinholster's new expert testimony changed "the factual basis" of his claim such that, by the time of the evidentiary hearing, he no longer satisfied §2254(e)(2). However, at oral argument, the State suggested that Pinholster was presenting an altogether new claim in the federal court. See Tr. of Oral Arg. 18. If that is the case, §2254(d)(1) does not apply at all, and the State should be arguing lack of exhaustion or procedural default. I do not understand Pinholster to have presented a new claim to the District Court.

In any event, Pinholster satisfied §2254(e)(2) in this case. He made "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Michael Williams*, 529 U. S., at 435. His experts relied on the very same facts and evidence. I cannot read §2254(e)(2) to impose a strict requirement that petitioners must use the same experts they presented to the state court. This rule would result in numerous practical problems, for example in the case of the unanticipated death of an expert.

State's own expert, Dr. Stalberg, testified to the "volumi-
nous" mitigation evidence in Pinholster's case. Record ER–
926.

In sum, the evidence confirmed what was already ap-
parent from the state-court record: Pinholster's counsel
failed to conduct an adequate mitigation investigation,
and there was a reasonable probability that at least one
juror confronted with the "voluminous" mitigating evi-
dence counsel should have discovered would have voted to
spare Pinholster's life. *Ibid.* Accordingly, whether on the
basis of the state- or federal-court record, the courts below
correctly concluded that Pinholster had shown that the
California Supreme Court's decision reflected an unrea-
sonable application of *Strickland.*[30]

\* \* \*

I cannot agree with either aspect of the Court's ruling. I
fear the consequences of the Court's novel interpretation
of §2254(d)(1) for diligent state habeas petitioners with
compelling evidence supporting their claims who were
unable, through no fault of their own, to present that
evidence to the state court that adjudicated their claims.
And the Court's conclusion that the California Supreme
Court reasonably denied Pinholster's ineffective-
assistance-of-counsel claim overlooks counsel's failure to
investigate obvious avenues of mitigation and the contrast
between the woefully inadequate mitigation case they
presented and the evidence they should and would have
discovered. I respectfully dissent.

---

[30] The State's challenge in this Court is limited to the questions
whether the Federal District Court was entitled to consider the addi-
tional evidence in the §2254(d)(1) analysis and whether Pinholster
satisfied §2254(d)(1) on the basis of the state-court record. It has not
challenged the District Court's ultimate conclusion that Pinholster had
proved that he was "in custody in violation of the Constitution or laws
or treaties of the United States." §2254(a).